PLANTERS PRODUCTION CREDIT ASSOCIATION *v.*
Charles W. BOWLES et al

74-300                                      511 S.W. 2d 645

Opinion delivered July 22, 1974

*Swift, Alexander & Burnett* and *Reid, Burge & Prevallet,* for appellant.

*Oscar Fendler, C. E. Lynch, Jr., Butler & Hicky,* for appellees.

*Joe C. Barrett,* for Planters PCA, amicus curiae.

J. FRED JONES, Justice. This is an appeal by Planters Production Credit Association, hereafter referred to as "PCA," from a chancery court decree denying judgment against the purchasers of cotton from Charles W. Bowles in a suit brought by PCA against Bowles and the purchasers of cotton raised by him and upon which PCA had perfected a secuity interest lien.

PCA was an association composed of approximately 365 members who borrowed money from the association to finance their individual farming operations. The association obtained the money it loaned to its members from federal sources and each member paid a membership fee of $5.00 for each $100 he borrowed. PCA took notes, financing statements and security agreements pledging crops and proceeds as security for crop loans made to its members.

Bowles farmed approximately 2,500 acres of Mississipp' County land primarily in cotton and soybeans. He had been a member of PCA from whom he obtained loans in financing his farming operations since 1950. He always repaid his loans without difficulty until in 1969 when he began having difficulty in  making his crop loan payments to PCA. By March 15, 1971, he owed PCA $146,162.99 which included a carryover from the previous year of $80,147.36 on a crop loan; $6,634.42 on a past due equipment loan, and $59,-381.11 on a so-called "interim financing" loan for current

miscellaneous expenses. On March 15, 1971, he borrowed an additional amount of $63,085.00 with which to finance his 1971 crop and gave a note to PCA for $209,622.99. On the same date he executed a financing statement and security agreement pledging his 1971 cotton, wheat and soybean crop, as well as certain farm equipment, as security to PCA.

During the 1971 crop year PCA refused to finance Bowles further unless he reduced his past due indebtedness, so he became indebted to others for chemicals and other supplies, and in 1971 he produced approximately 1,100 bales of cotton. He sold futures on a part of his cotton and when the cotton was harvested, he sold it but failed to apply all the proceeds to his indebtedness to PCA.

The relationship of the parties is set out in the complaint filed by PCA on May 31, 1972, in which it alleged in part as follows:

"2. . . .[T]he Defendant, Charles W. Bowles, produced approximately 1100 bales of cotton of an approximate value of $160,000.00 for which the plaintiff was entitled to receive the proceeds.

3. . . .[T]he Defendant, Charles W. Bowles, failed to pay plaintiff the proceeds or to deliver said cotton crop and instead delivered 704 bales of cotton to the Defendant, Keiser Supply Company, which were ginned and sold to the Defendant, Hohenberg Brothers Company, which issued its drafts to Lee Wilson Company through Keiser Supply Company, which in turn, applied the proceeds to accounts with Lee Wilson Company Seed and Chemical Division, an open account, and to Keiser Supply Company, all in direct contravention and with prior notice of the plaintiff's prior and paramount lien by way of its recorded mortgage. That the Defendant, Charles W. Bowles, also delivered 137 bales of cotton to Allen Seagraves, who ginned said cotton, which was subsequently sold to the Defendant, Gordon Wiseman; that an additional 110 bales were sold under the fictitious name of 'Dunbar Bradey' with the intention of defrauding plaintiff and others.

That the Defendants, Bluff City Cotton Company and Bluff City Cotton Company, Inc., purchased 176 bales of cotton delivering their drafts to the Defendant, Charles W. Bowles, without delivering the proceeds from said sale to the plaintiff. . . ."

PCA prayed joint and several judgment in the amount of $160,000 against all the named defendants, or in the alternative it prayed a return of the cotton collateral.

The chancellor decreed judgment in favor of PCA against Bowles for $75,867.49 and decreed that PCA was not entitled to judgments against the other defendants on findings recited in the decree as follows:

"[T]he court expressly finds that the Plaintiff, Planters Production Credit Association, by its course of conduct through a number of years in regard to authorizing the Defendant, Charles W. Bowles, and all of its other borrowers to sell and otherwise dispose of crops which Bowles and the borrowers had produced and harvested receive the cash proceeds from the sale and dispose of same and to use such proceeds in such manner as the Defendant Bowles and other borrowers deemed proper, waived its lien under the financing statement and security agreement that the Plaintiff had taken from the Defendant, Charles W. Bowles, for the year 1971 and for the crops involved in this lawsuit. As a result of said waiver, all of these Defendants and Cross-Defendants except the wife of the Defendant, Jane C. Bowles, purchased such crops grown by the Defendant Bowles in 1971 free of the lien claimed by the Plaintiff or received the money from the sale of those 1971 crops free of any such lien."

On appeal to this court PCA has designated the points on which it relies for reversal as follows:

"Appellant had a security interest in Bowles' crops and the proceeds therefrom for $75,867.49 plus interest and costs.

The lower court erred in ruling that appellant waived its

lien by reason of a course of dealing between it and its debtor-Bowles, or as a result of custom and usage in the trade.

Appellee, Lee Wilson & Company's alleged landlord's lien for furnish and supplies is invalid and appellant is entitled to judgment against it for $40,337.50.

Appellant is entitled to judgment against appellee Hohenberg Brothers Company for $40,337.50.

Appellant is entitled to judgment against appellee Gordon Wiseman for $30,720.70.

Appellant is entitled to judgment against Louis B. Strong, d/b/a Bluff City Cotton Company for $17,946.45.

Appellant is entitled to judgment against Jane Bowles, d/b/a Bowles Liquor Store, Bowles Stop and Shop Grocery and Bowles Pawn Shop for $34,806.37."

We disagree with the appellant's first two contentions, consequently we find it unnecessary to discuss the others.

The real question before us, and actually one of first impression in Arkansas, is whether a secured creditor may waive his security interest in collateral in favor of a third party purchaser of the collateral simply by his course of dealing with the debtor rather than by express or written waiver under the Uniform Commercial Code, as adopted in this state. We agree with the chancellor that PCA did so under the peculiar facts and circumstances of the case before us.

Ark. Stat. Ann. § 85-9-306 (1) (2) (Repl. 1961) provides as follows:

"(1) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds.'

(2) Except where this Article [chapter] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

Ark. Stat. Ann. § 85-9-316 (Repl. 1961) reads as follows:

"Nothing in this Article [chapter] prevents subordination by agreement by any person entitled to priority."

The Code definition of "agreement" is found in § 85-1-201 (3) as follows:

" 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208 [§§ 85-1-205, 85-2-208]). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-1-3 [ § 85-1-103]). . . ."

As already stated, the security agreement in this case covered crops to be raised by Bowles on specifically described land. The proceeds from the sale of wheat and soybeans were applied on the PCA indebtedness and only the sale of cotton is involved in this case. Under Item 5 of the security agreement it was extended to "products and proceeds" in lanaguage as follows:

"All products into which the goods and property described or referred to under Items 1 to 4, inclusive, or any part thereof, have been or shall at any time hereafter be manufactured, processed, or assembled; and all cash and non-cash proceeds from the sale, exchange, collection, or other dispostition of any of said goods and property; and all accounts receivable resulting from the sale or other disposition of any of said goods or property."

Under the heading "Terms, Conditions, Warranties, and Agreements," the financing statement and security agreement contain language as follows:

"Secured Party shall have the right to inspect said goods and property at any time. If said goods and property or any part thereof shall not, in the opinion of Secured Party, properly develop or progress, or be properly cultivated, tended, cared for, harvested, or marketed, or if the security shall depreciate in value, or if Secured Party shall deem itself insecure, Secured Party shall be under no obligation to make advances in accordance with any commitment, and may, in any such case, at the expense of Debtor (s), take possession of any of said property, and cultivate, tend, care for, harvest, and market the same; and all moneys paid or obligations incurred by Secured Party for any such purpose shall immediately be due and payable by Debtor(s) to Secured Party, with interest at the rate borne by the primary indebtedness hereby secured, and shall be secured hereby. Debtor(s) shall pay to and reimburse Secured Party for any and all other sums paid, furnished, or advanced by Secured Party for insurance, taxes, satisfaction of liens or encumbrances, and costs and expenses paid or incurred by Secured Party, including reasonable attorney fees, in the preservation of the security, or in any action or proceeding to establish or enforce the lien hereof; and all such sums, with interest at the rate borne by the primary indebtedness hereby secured, shall be secured hereby.

If default be made in the payment of the indebtedness hereby secured or any part thereof, or with respect to any of the terms, conditions, warranties, covenants, or agreements herein contained; or in the event of a marked depreciation in the value of the security; or if Secured Party shall deem itself insecure; then the entire debt and obligations hereby secured shall, at the option of Secured Party, its successors and assigns, and without notice, be and become immediately due and payable and Secured Party, its successors and assigns, may thereupon enter upon the premises on which said

property is situated and take possession of the goods and property covered hereby, and harvest, gather, store, pack, and prepare the same for market; and may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or process thereof. Disposition of the collateral may be by public or private sale. If the collateral is perishable, or threatens to decline speedily in value, or is of a type customarily sold on a recognized market, the collateral may be sold without notice to Debtor(s). Secured Party shall give Debtor(s) notice in writing of the sale of all other collateral, three days prior to sale, by mailing a copy of said notice, postage prepaid, addressed to the last known place of business or residence of Debtor(s). The reasonable expense of retaking and holding said property, and of preparing the same for and conducting the sale, and the reasonable expenses paid or incurred in connection therewith, including all legal expenses paid or incurred and reasonable attorney fees, shall be paid, or reimbursement therefor shall be made, out of the proceeds of the sale or disposition of said property."

The testimony of the parties and witnesses is not germane to the precise issues before us, except the testimony of Mr. Conrad White, the president and general manager of PCA. We shall not set out Mr. White's testimony in detail because according to his uncontroverted testimony there is simply no question and no doubt that PCA, as a general practice and as a general course of procedure, permitted all its members to sell or dispose of collateral at will, and relied on the member-debtor's honesty and integrity in applying the proceeds from such sale or disposition to the payment of his indebtedness to PCA.

According to Mr. White, it would appear that PCA was satisfied with this procedure and it worked very well. He said membership loans increased from approximately seven million dollars in 1965 to over fifteen million in 1971, and their loss ratio had been much less that one per cent. Mr. White testified that prospective third party purchasers of collateral had requested lists of PCA member-debtors and that such

requests had been denied because it was the policy of PCA to refuse such requests.

It is recognized by the attorneys for all parties that there is a split of authority as to the interpretation the courts have placed on that part of the Code provision § 85-9-306 (2), *supra,* reading, "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement *or otherwise.*" (Emphasis added). Of course, such action was not authorized except by implication in the security agreement in the case at bar so, the question comes down to whether it was authorized under the "or otherwise" phrase.

The parties recognize the 1967 New Mexico case of *Clovis Nat'l Bank* v. *Thomas*, 77 N.M. 554, 425 P. 2d 726, as the leading case in which the secured party waived its lien under the "or otherwise" phrase of the Code. In that case the New Mexico Code § 50A-9-306 (2) was identical to our § 85-9-306 (2) *supra*. The bank had loaned money on cattle in *Clovis* and the security agreement required written permission to sell. The bank, as secured party, permitted the debtor to sell the collateral (cattle) and relied on his honesty to apply the proceeds on the loan. The borrower finally sold some of the cattle at auction and failed to apply the proceeds to the secured indebtedness. In a suit against the auctioneer for conversion, the court held that the bank's course of dealing in permitting the debtor to sell collateral and deposit the proceeds from such sales in his bank checking account from which he then made payments on his indebtedness, the bank waived its security interest lien on the cattle.

We have been favored with an excellent amicus curiae brief in this case in which it is pointed out that the *Clovis* decision brought about such storm of protest that the New Mexico Code was amended as follows:

> "A security interest in farm products and the proceeds thereof shall not be considered waived by the secured party by any course of dealing between the parties or by any trade usage."

No such amendment has been added to the Arkansas Code §

85-9-306 (2). The above amendment to the New Mexico Code was adopted in 1968, and in the 1973 case of *Lisbon Bank & Trust Co.* v. *Murray* v. *Meier*, 206 N.W. 2d 96, the Iowa Supreme Court seemed unimpressed by whatever protest might have brought about the amendment of the Code in New Mexico following the *Clovis* decision because in *Lisbon* the Iowa Court followed the same reasoning and reached the same results as the New Mexico Court did in *Clovis* in applying an identical section, 554.9306 (2), of the Iowa Code to almost identical facts appearing in *Clovis*. The Lisbon Bank & Trust Company was the secured party in the Iowa case and perfected a security interest in cattle purchased by Meier with money he borrowed from the bank. Meier sold some of the cattle to Murray for $2,428.80 and subsequently defaulted on his note to the bank and filed bankruptcy. The bank sought to recover the $2,428.80 from Murray on the theory he purchased the cattle subject to the bank's lien. The trial court found that the cattle were purchased free of the lien. In affirming the judgment the Iowa Supreme Court said:

> "Sale may be authorized by the secured party 'in the security agreement or otherwise.' § 554.9306 (2), The Code. The security agreement in this case did not authorize sale and therefore the bank cannot be held to have waived its security interest in the collateral unless it 'otherwise' consented to the sale.

> There was evidence the Meiers lived on a 33 acre tract near Lisbon where they bred sows, farrowed feeder pigs, grew hay and grazed livestock. The bank started loaning Glenn Meier money on his livestock operation in January 1968. Several loans covered by security agreements were made prior to January 15, 1969. At trial the bank acknowledged a general course of dealing, notwithstanding the security agreements, permitting him to sell collateral and apply the proceeds either to substitutions or on the notes.

> \* \* \*

A leading case on establishment of authority to sell secured farm products under the Uniform Commercial

Code is Clovis National Bank v. Thomas, 77 NM 554, 425 P2d 726 [4 UCC Rep 137] (1967). There the security agreement expressly prohibited sale of the collateral without the prior written consent of the secured party. The court found the secured party had nevertheless as a matter of common practice permitted the debtor to make such sales without prior written consent. The secured party was held to have waived the requirement of written consent and its security interest."

In the *Clovis* and *Lisbon* cases the secured parties were regular bank lending institutions and the evidence as to prior mode of dealing was between secured banks and the individual borrower involved. The collateral was cattle actually purchased with the money borrowed. In the case at bar the secured party was an association composed of the debtor Bowles and approximately 365 other like member-debtors of the association. The collateral was growing crops to be harvested and sold. PCA not only had a policy among all its member-debtors of permitting them to sell and dispose of collateral at will and be individually responsible to PCA in applying the proceeds of such sales to the loan indebtedness; PCA protected its membership identity from prospective purchasers of the members products.

We conclude that under the facts and circumstances of this particular case, the chancellor's findings were not aginst the preponderance of the evidence, and the chancellor did not err in applying the law to the facts in this case.

The decree is affirmed.

BYRD J., dissents.