**REX FINANCIAL CORPORATION,**
**Plaintiff,**

v.

**Doyle MARSHALL and the Citizens Bank of Booneville, Booneville, Arkansas, Defendants,**

**John P. Rose, Third-Party Defendant.**

**No. FS–74–117–C.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Jan. 7, 1976.

---

C. Richard Lippard, Booneville, Ark., for plaintiff.

William G. Wright, Hardin, Jesson & Dawson, Fort Smith, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

Plaintiff, Rex Financial Corporation, commenced this action against the defendants on October 17, 1974. In paragraphs IV to IX of its complaint plaintiff alleged that on or about February 26, 1973, it entered into an agreement with Rose's Mobile Homes, Inc., an Arkansas corporation, in which Rex agreed to floor plan the inventory of Rose's Mobile Homes, Inc., and to purchase retail installment contracts, notes and chattel paper acquired by Rose from retail purchasers of mobile homes; that Rose's Mobile Homes, Inc., through its President, John P. Rose, executed a financing statement which, among other things, covered new and used mobile homes or travel trailers, and any and all parts, additions, and accessories appertaining thereto now or hereafter acquired.

That on January 24, 1973, one Carl G. Whitley entered into an installment sales contract and security agreement with Rose's Mobile Homes for the purchase of one 1972 Fairway 12 x 61 mobile home, serial number 2662, to be paid over a period of 120 months at the rate of $97.37 per month. On the next day, January 25, 1973, Rose's Mobile Homes executed an assignment of the installment sales contract and security agreement to the plaintiff, Rex. Thereafter, pursuant to Ark.Stat.Ann., § 75–132 et seq., (1957 Repl.), and in conformity with the installment sales contract and security agreement, the State of Arkansas issued a certificate of title covering the aforesaid mobile home sold to Carl G. Whitley, reflecting in the certificate a lien in favor of Rex. Sometime prior to June 13, 1974, the exact time unknown to plaintiff, John P. Rose, acting for and on behalf of Rose's Mobile Homes, and without the knowledge or consent of plaintiff, Rex, took possession of the 1972 Fairway mobile home which had been sold and delivered to Carl G. Whitley, and upon which plaintiff maintained a lien of record as reflected by the certificate of title. That there remains an outstanding indebtedness to the plaintiff under the terms of the installment sales contract and security agreement entered into by Carl G. Whitley the sum of $7,117.34, with interest at 10 percent from and after August 19, 1974, together with a reasonable attorney's fee.

It is further alleged that on or about March 27, 1974, Rose's Mobile Homes executed a security agreement and promissory note evidencing a principal indebtedness in the amount of $7,416.00 to

plaintiff Rex for the floor planning by plaintiff of two mobile homes:

(1) One 1974 new style 12x50, serial No. 2368, invoice price      $3,708.00

(2) One 1974 new style 12x50, serial No. 2366, invoice price      $3,708.00

Total      $7,416.00

The plaintiff retained the certificate of origin to the units above described and has not delivered any other indicia of ownership covering the two 1974 new style mobile homes.

That on or about June 13, 1974, Rose's Mobile Homes, without the knowledge or consent of plaintiff, entered into an agreement with the defendant Doyle Marshall wherein the said defendant agreed to purchase for cash the three mobile homes hereinbefore described, and upon which plaintiff holds a security interest under the terms of the security agreements and certificate of title as heretofore set forth.

That the amount due plaintiff on the 1972 Fairway mobile home, serial No. 2662, is $7,117.34, with interest from August 19, 1974, at 10 percent; that the amount due on the two 1974 new style mobile homes, serial Nos. 2366 and 2368, is $7,416.00, with interest at 10 percent from March 27, 1974.

On November 21, 1974, the defendants Doyle Marshall and The Citizens Bank of Booneville filed their answer in which they alleged that they did not have sufficient knowledge or information on which to form a belief as to the truth of the allegations set forth in the complaint in paragraphs IV to XI, inclusive, except in paragraph VIII of their answer defendants admit that Doyle Marshall did on June 13, 1974, purchase from Rose's Mobile Homes the three mobile homes heretofore described, and The Citizens Bank of Booneville claims an interest in and to the said mobile homes by virtue of a combination note (disclosure and security agreement) dated June 14, 1974, in the principal amount of $12,825.00.

In paragraphs XI to XVI the defendants alleged that Doyle Marshall in good faith believed that Rose's Mobile Homes had title and authority to sell said mobile homes, and in accordance with Ark. Stat.Ann., § 85–2–401 et seq., he acquired good title to said mobile homes free and clear of all liens and encumbrances of plaintiff; that the plaintiff entrusted Rose's Mobile Homes with the possession of said mobile homes and knew that it was a merchant which dealt in goods of the kind described in the complaint and had authority to transfer said mobile homes to a buyer in the ordinary course of business; that the plaintiff is a foreign corporation not qualified to do business in the State of Arkansas and is barred from maintaining this suit; that the plaintiff failed to perfect its security interest, if any, in the mobile homes; that John P. Rose and Rose's Mobile Homes were acting as an agent for and on behalf of plaintiff when said mobile homes were sold to the defendant Marshall; that said transaction was fraudulent and that Rose, on behalf of Rose's Mobile Homes, in his capacity as agent and on behalf of plaintiff deceived the defendant Marshall and fraudulently induced him to purchase said mobile home units to his detriment.

On November 27, 1974, plaintiff, Rex, filed its reply to the claims of defendants, and denied the claims set forth in their counterclaim.

On June 20, 1975, the defendants filed their third party complaint against John P. Rose, but service of process has not been had on the said Rose.

The plaintiff prays that the security interest of Rex in and to the aforesaid three mobile homes be declared and adjudged the first preferred lien on said property prior and paramount to the lien of the defendants or any of them and all other persons; that plaintiff's lien on the 1972 Fairway mobile home be declared to be in the sum of $7,117.34, with interest at the rate of 10 percent per annum from August 19, 1974, with a reasonable attorney's fee and that the lien on the

1974 new style mobile homes be declared to be in the sum of $7,416.00, plus interest from and after March 27, 1974, at the rate of 10 percent, together with a reasonable attorney's fee, and that all right, title, claim, equity and/or right of redemption of the defendants be forever barred and closed; that said property be sold for the purpose of satisfying said indebtedness in the manner provided by law and under such terms as the court may deem proper.

The prayer of the answer of defendants is that the plaintiff's complaint be dismissed at plaintiff's cost; that the title and possession of the mobile home units be vested in Doyle Marshall subject only to the lien of The Citizens Bank of Booneville, free and clear of all liens and encumbrances of Rex, and that Rex be ordered and directed to deliver to the defendants the certificates of title and certificates of origin of the said mobile home units fee and clear of all liens and encumbrances.

The plaintiff, Rex, is a corporation organized under the laws of the State of New Jersey with its principal place of business at Englewood Cliffs, New Jersey. It is a wholly owned subsidiary of Rex-Noreco, Inc., also a New Jersey corporation.

The defendant Doyle Marshall is a citizen of Arkansas and a resident of the Western District of Arkansas. The Citizens Bank of Booneville is a banking corporation with its principal place of business in the Western District of Arkansas.

The court has jurisdiction based upon diversity of citizenship and the amount involved.

On December 1, 1975, the parties filed a joint stipulation of facts and exhibits A through L, and on December 3, 1975, filed an additional joint stipulation of facts and exhibits A and B.

The parties have briefed and argued their respective contentions.

The defendants on page 2 of their brief state:

"The Stipulations of Fact and Affidavit represent the evidence which the parties to this action would have introduced into evidence had this cause come on for a regular trial. The Stipulations and affidavit may be considered by this Court in all respects as though the same were testified to by the parties and their respective witnesses.

"The mobile homes upon which Plaintiff claims a lien consist of one used 1972 Fairway Mobile Home, and two new 1974 New Style Mobile Homes. The two new 1974 New Style Mobile Homes were covered by a floor planning arrangement between Rex and Rose's Mobile Homes, Inc. The used mobile home was originally sold by Rose's Mobile Homes, Inc. to a third party, was financed by Rex, and upon default by that buyer, the mobile home was repossessed through Rose's Mobile Homes, Inc. who then put up the mobile home for resale.

"The Defendants see no distinction between the issues to be presented to the Court for the two new mobile homes as opposed to the used mobile home. The only distinction that the Defendants have determined is the manner in which Rex perfected its security interest in the mobile homes. The Defendants respectfully submit that the manner in which Rex perfected its security interest does not affect the substantive rights of the litigants nor should it affect the outcome of this litigation. Therefore, the Defendants will brief their position on the three mobile homes together rather than separately as was done by the plaintiff.

## I.

"The question clearly presented to the Court is whether or not Marshall's rights as a buyer are protected under the Uniform Commercial Code against any security interest in the mobile homes claimed by Rex."

The court commends defendants for their frankness. There is indeed little, if any, dispute concerning the facts, but in view of their contentions the court believes that the material and decisive

facts should be set forth prior to a discussion of the applicable law.

## FINDINGS OF FACT

(1) John P. Rose, prior to the incorporation of Rose's Mobile Homes, contacted Rex on September 20, 1972, requesting that Rex extend to him a line of credit for floor planning and purchasing of contracts on mobile home sales at his sales lot in Fort Smith.

In addition to the Financing Statement, Exhibit A to stipulation of facts filed December 1, 1975, Rose's Mobile Homes executed Recourse Agreement and Floor Plan Security Agreement Inventory and Signatory Authorization, Exhibits A and B to the additional joint stipulation of facts filed December 3, 1975. The Recourse Agreement provides in pertinent parts as follows:

"3. Dealer makes and continues to make the following warranties and representations in respect of each obligation purchased by Lender:

\* \* \* \* \* \*

(1) Dealer will not, without Lender's prior written consent, accept a return of the goods, give a credit to Buyer by reason of any matter connected with the transaction from which the obligation arose, nor give an allowance nor make any settlement with Buyer which, directly or indirectly, affects the latter's liability under the obligation."

With the exception of occasional visits by field representatives of Rex who would check the accuracy of the list of floor plan inventory, all business was done through the mail or by telephone conversations between Rose or other employees with the City of Fort Smith and agents and employees of Rex located in Englewood Cliffs, New Jersey.

Paragraph 5 of the stipulated facts reads as follows:

"5. At all times herein material, Rex Financial Corporation was the floor plan financer for Rose's Mobile Homes, Inc., financing the new and used inventory of that business, and also purchasing the Retail Installment Contracts, Notes and chattel papers which were acquired by Rose's Mobile Homes, Inc., from retail purchasers of the mobile homes sold by that business."

A financing statement, Exhibit A, covering new and used mobile homes and/or travel trailers, and any and all parts, additions or accessories appertaining thereto, now or hereafter acquired is attached to the stipulation of facts of December 1, 1975. The financing statement was filed for record in the office of the Circuit Clerk of the Fort Smith District of Sebastian County, Arkansas, on February 26, 1973, Exhibit A, and in the office of the Secretary of State on February 27, 1973, Exhibit B.

(2) On or about January 24, 1973, Carl G. Whitley entered into an installment sales contract and security agreement with John P. Rose for and on behalf of Rose's Mobile Homes concerning one 1972 Fairway 12 x 61 mobile home, serial number 2662, the purchase price to be paid over a period of 120 months at the rate of $97.37 per month. A correct copy of the installment sales contract and security agreement is attached as Exhibit C to the stipulation of facts of December 1, 1975. On January 25, 1973, Rose assigned to Rex the contract and all monies coming due thereunder and all of the right, title, and interest in and to the property therein conveyed. Thereafter, the State of Arkansas, Motor Vehicle Division, Department of Finance and Administration, issued a certificate of title covering the aforesaid mobile home sold to Carl G. Whitley, and that title reflected a lien in favor of Rex, as shown by Exhibit D to the stipulation of facts.

(3) Paragraph 13 of the stipulation is a statement of Willota Green, formerly Mrs. Carl G. Whitley. The statement reflects that Mr. and Mrs. Whitley were divorced on May 2, 1974, and the last payment made by Whitley on the contract was in March 1974. Rex was also advised of the divorce and default by Whitley. On August 19, 1974, there was

due on the Whitley contract the sum of $7,117.34 at time of default.

(4) Following the failure of Whitley to pay the monthly installments, Rose's Mobile Homes took possession of the 1972 Fairway mobile home described in the contract, and had possession of it until the sale and delivery of the same to the defendant Marshall on June 14, 1974, for the sum of $5,000.00 in cash. (Exhibits F and G to stipulation.)

On or about March 27, 1974, Rose's Mobile Homes entered into a contract with Rex for two other mobile homes, serial numbers 2368 and 2366, which Rex caused to be delivered. Rose's Mobile Homes then executed its note for $7,416.00 payable to Rex and mailed the note and security agreement to Rex, Exhibit E.

The note was payable to Rex-Noreco, Inc., instead of Rex Financial Corporation. Doris W. Oelbaum, Assistant Secretary of Rex, in an affidavit filed herein stated:

"That due to a scrivener's error, officers of employees of Rose's Mobile Homes, Inc., made the security agreement and the promissory note in favor of Rex-Noreco, Inc., the parent company, although John Rose and his employees understood that the Security Agreements and Promissory Notes were to be made in favor of Rex Financial Corporation. In order to correct the scrivener's error. Rex-Noreco, Inc., assigned all of its right, title and interest in and to the Receipt and Security Agreement and Promissory Note dated March 27, 1974, to Rex Financial Corporation. A copy of this assignment is attached hereto marked as Exhibit D, and by reference is incorporated herein."

When Rose's Mobile Homes sold the three mobile homes to defendant Marshall, it executed and delivered to Marshall a bill of sale reciting the consideration for each home, and stating that it "grants, bargains, sells and assigns" all of its right, title and interest to the mobile homes to the purchaser Marshall.

On each of the bills of sale the following notation appears: "subject to conformation of title and subsequent satisfaction by holder." Exhibits G, H and I to stipulation of facts filed December 1, 1975. In Exhibits H and I the serial number is erroneously stated as 2386 when it should have been 2368.

(5) Paragraph 18 of the joint stipulation of facts filed December 1, 1975, states:

"18. If the Third-Party Defendant, John P. Rose, were called to testify, his testimony would be in accordance with that which he gave by deposition on August 9, 1975 [1974] in the case of *Rose, et al. v. Rex, et al.,* Fort Smith District Case No. FS–74–61–C, and specifically that appearing at pages 55 through 68 of said deposition."

In the case filed May 17, 1974, Rose's Mobile Homes and Rose individually, plaintiffs, sought a declaratory judgment holding that all the notes, security agreements and other instruments executed by plaintiffs to defendants were void and unenforcible and that plaintiffs were entitled to the absolute titles and ownership of all property free and clear of all liens.

Rex directed a letter dated May 23, 1974, to Mr. Rose, President, demanding payment in full forthwith of his entire floor plan balance in the sum of $48,-629.00, plus accrued interest, and on June 4, 1974, Rex wrote Rose again demanding payment of the balance owing it for the purchase of retail installment contracts. The amount due at that time on that item was $164,691.47.

Extensive discovery was engaged in, and that case was tried to this court on August 22, 1974. Judgment was rendered November 6, 1974, 383 F.Supp. 937, for Rex on all issues made in the pleadings. While that suit was pending, the instant suit was commenced October 17, 1974.

(6) During the discovery process in the Rose case, he testified by deposition on August 9, 1974, and it is that deposition that is referred to in paragraph 18 of the

stipulation. In the deposition beginning at the bottom of page 55, Mr. Rose testified that if it became necessary to repossess a unit, that he would pick it up and bring it to the lot. Rex never asked for a payoff. The repossessed home would be cleaned up in an effort to find some other purchaser who would take over and assume the payments. He never had the authority to release any home except on the approval and instruction of Rex. If another buyer was found, the same procedure in selling it to the other buyer was as in the original sale.

As to the repossession of the Carl Whitley mobile home that he repossessed and subsequently sold to Mr. Marshall, Rose did not contact Rex to get permission to make the sale to Marshall and Marshall paid cash for it. He sold Marshall two of the seven floor plan units that were then on the lot and received cash for them which he never remitted to Rex.

On November 27, 1974, plaintiff propounded and submitted interrogatories to defendant Marshall.

Interrogatory No. 3 was as follows:

"Interrogatory No. 3: What was the substance of your conversation with John P. Rose or any other person, firm or corporation on behalf of Rose's Mobile Homes, Inc. concerning the delivery of the Certificates of Title or Certificates of Origin covering each of the three (3) mobile homes which are described in the Plaintiff's Complaint and your Answer and Counterclaim?"

It was answered by Marshall as follows:

"Answer No. 3: When I requested Certificates of Title on June 14, 1974, the date I purchased the three (3) mobile homes which are described in the Plaintiff's Complaint and my Answer and Counterclaim, I was advised by John P. Rose that it would take approximately one (1) week for the necessary papers to be forwarded to Little Rock for proper recording. Mr. Rose advised me that after the papers were returned to him he would forward the Certificates of Title to me immediately."

Interrogatory No. 6 was as follows:

"Interrogatory No. 6: Have you ever purchased a mobile home from Rose's Mobile Homes, Inc., or John P. Rose, prior to the purchase of the three (3) mobile homes described in Plaintiff's complaint and your answer and counterclaim? If so, for each such home, state:

(a) The date of purchase;

(b) Whether or not such mobile home was financed and with whom it was financed; and

(c) The present location or locations of said home or homes."

The answer thereto was as follows:

"Answer No. 6: Yes.

(a) February, 1972.

(b) This mobile home was financed through Rex Financial Corporation.

(c) This mobile home is presently located in Blue Mountain, Arkansas."

(7) Paragraphs 33, 34, 35, 36 and 37 of the stipulation filed December 1, 1975, disclose:

That defendant Marshall dealt directly with Rose who did not advise him that there was a lien on the three homes; that he believes he questioned Rose in regard to the language concerning "Subject to confirmation of title and subsequent satisfaction of holder," but does not recall the exact answer given by Rose. Marshall consulted with two to four factories concerning the purchase of two of the three mobile homes and it was his belief based upon the figures given by the manufacturers that he was purchasing the two new style mobile homes at a cost less than the then-current factory price.

The discovery deposition of defendant Marshall was taken March 7, 1975, and filed June 4, 1975. He testified that in February 1972 he bought a mobile home from Rose, doing business as Rose's Mobile Homes, and financed it "with Rex

Financial Corporation." Rose said "they were financing his mobile homes." He further said that he was making payments to Rex on that home. He bought the three other homes from Rose because "I could buy them cheaper than any others at that price." He told Rose he would finance the homes through the bank and pay him cash. Rose had eight or ten on the lot at that time. He told me that he was moving to Oklahoma. He gave me "the idea". "He didn't say that but I thought that would be it." "He told me that—that in about two weeks he would have me a title. He went back two times to see Rose about the title. "After two or three weeks the man from Rex Financial Corporation called me at home that they were his trailer houses and that he had title on them."

As to the transaction between Marshall and The Citizens Bank of Booneville, it is stated in the stipulation of facts as follows:

"43. Doyle Marshall, on June 14, 1974, secured a loan from The Citizens Bank of Booneville, Booneville, Arkansas, in the principal amount of $12,816.00, which loan listed as security the three mobile homes hereinabove described, together with two tracts of real property lying in the Morris Addition to Blue Mountain, Arkansas. A true and correct copy of the combination Note (Disclosure and Security Agreement) dated June 14, 1974, is attached hereto as Exhibit L and by this reference made a part hereof.

"44. The Combination Note (Disclosure and Security Agreement) Exhibit L hereto, was not filed for record in the office of the Circuit Clerk of the Southern District of Logan County, Arkansas, nor with the Secretary of State of the State of Arkansas, nor with the Motor Vehicle Division, Department of Finance and Administration, State of Arkansas.

"45. A financing Statement and Security Agreement, dated June 14, 1974, was executed by Doyle Marshall in favor of The Citizens Bank of Booneville, Arkansas, which correctly describes the used Fairway Mobile Home and each of the two New Style Mobile Homes, certain furniture and fixtures located within the mobile homes, and the real property located within the Morris Addition to Blue Mountain, Arkansas. Attached hereto as Exhibit M is a true and correct copy of the Financing Statement and Security Agreement executed by Doyle Marshall.

"46. The Financing Statement, Exhibit M hereto, was not filed for record with the Office of the Circuit Clerk of the Southern District of Logan County, Arkansas, nor with the Secretary of State of the State of Arkansas, nor with the Motor Vehicle Division, Department of Finance and Administration, State of Arkansas."

## THE APPLICABLE LAW

The Uniform Commercial Code was enacted by the General Assembly of Arkansas as Act 185 of 1961, and is now Volume 7C, Arkansas Statutes (1961 Adden.). The act became effective January 1, 1962.

In 30 A.L.R.3d, beginning on page 9, there is an annotation on the scope of Article 9 of the Act. In the preface, page 16, it is stated:

"This annotation discusses all of the cases construing Article 9 of the Uniform Commercial Code, which deals with secured transactions and with sales of accounts, contract rights, and chattel paper. No attempt is made herein to exhaustively collect all of the cases which quote, cite, paraphrase, or otherwise make reference to Article 9."

Beginning at page 31 the General Principles of the act are set forth as follows:

"The Uniform Commercial Code represents an entirely new approach in several areas of commercial law, and especially in secured transactions. Article 9, dealing with secured transactions, is a comprehensive scheme for

the regulation of security interests in personal property, and is intended to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and greater certainty.

"Article 9 does not observe the traditional formal distinctions between security devices. Under Code § 9–102, the single term 'security interest' applies to all transactions intended to create security interests in personal property and fixtures, even though the old descriptive terms, such as chattel mortgages, conditional sales, trust receipts, and factors' liens, may still be used. Code § 9–202 expressly provides that every provision of Article 9 with regard to rights, obligations, and remedies applies whether title to collateral is in the secured party or in the debtor. Thus, Article 9 adopts neither a title theory nor a lien theory of security interests, and the rights of parties are determined irrespective of the location of legal title.

"Code § 1–102(2)(c) provides that one of the underlying purposes and policies of the Uniform Commercial Code is to make uniform the law among the various jurisdictions. The realization of this purpose demands that as far as possible the meaning of the law must be gathered from the instrument itself, unfettered by anachronisms indigenous to the respective jurisdictions in which it is in force. In accordance with this objective, the highest court in one jurisdiction announced in an Article 9 case that it was adopting a rule of construction that the Code is plenary and exclusive except where the legislature has clearly indicated otherwise."

The act provides, Ark.Stat.Ann., § 85–9–102:

"(1) Except as otherwise provided in Section 9–103 [§ 85–9–103] on multiple state transactions and in Section 9–104 [§ 85–9–104] on excluded transactions, this Article [chapter] applies so far as concerns any personal property and fixtures within the jurisdiction of this state.

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also

(b) to any sale of accounts, contract rights or chattel paper.

"(2) This Article [chapter] applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This Article [chapter] does not apply to statutory liens except as provided in Section 9–310 [§ 85–9–310].

"(3) The application of this Article [chapter] to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article [chapter] does not apply."

While all three of the mobile homes were purchased by defendant Marshall from Rose's Mobile Homes on the same day, June 14, 1974, and the purchase price was paid, it seems necessary to discuss the purchase of the 1972 Fairway, serial No. 2662, to some extent separately from the issues relating to the other two mobile homes, the 1974 new style, serial Nos. 2366 and 2368.

Ark.Stat.Ann., § 85–9–302 (1961 Adden.), provides that a financing statement must be filed to perfect all security interests with certain exceptions set forth in the statute which do not apply to the claims of plaintiff involved herein.

A financing statement signed by Rose's Mobile Homes by John P. Rose and Rex Financial Corporation was filed on February 26, 1973, Exhibit A to the December 1, 1975, stipulation. A copy of said statement was filed with the Secretary of State of Arkansas on February

27, 1973, and also with the Circuit Clerk of the Fort Smith District of Sebastian County, Arkansas, on February 26, 1973. The financing statement included the following types of items of property in addition to other types mentioned therein:

"(a) new and used mobile homes or travel trailers and any and all parts, additions, and accessories appertaining thereto now or hereafter acquired.

"(b) the proceeds from the sales of new and used mobile homes and/or travel trailers and any and all parts, additions and accessories appertaining thereto now or hereafter acquired."

When Carl G. Whitley purchased the 1972 Fairway, serial No. 2662, on January 24, 1973, he executed and delivered to Rose's Mobile Homes his promissory note for the purchase price, interest and other costs. The contract and note were assigned by Rose to Rex Financial Corporation on March 25, 1973, Exhibit 3 to stipulation of December 1, 1975. Following the execution of the sales contract and the security agreement and the assignment, the State of Arkansas, Motor Vehicle Division, issued a certificate of title covering the said home sold to Whitley. The certificate of title shows there was a lien on the vehicle in favor of Rex Financial Corporation. See paragraph 2 of the findings of fact.

Beginning on page 5 of its brief, the plaintiff states:

"It is the position of the Plaintiff Rex that it has the only valid and perfected security interest in the 1972 Fairway Mobile Home, and that this security interest entitles it to possession of said mobile home, or in the alternative to the balance due under the Conditional Sales Contract which it acquired from Rose's Mobile Homes, Inc., together with the interest and attorneys' fee due thereon. Pursuant to Ark.Stat.Ann., § 75–160 and § 75–161 (Supp.1973) there is only one method by which a party may perfect a security interest in a vehicle subject to the titling statutes in the State of Arkansas. A mobile home such as the 1972

Fairway Mobile Home comes within the purview of this Section by virtue of Ark.Stat.Ann., § 75–102(f) (Supp. 1973), which describes a mobile home as 'every house trailer or other vehicle', and Ark.Stat.Ann., § 75–132 (Supp.1973) which requires that 'every motor vehicle, trailer, semitrailer, and pole trailer, when driven or moved upon a highway, and every mobile home, shall be subject to the provisions of this Act. [§§ 75–101—75–133, 75–134—75–140, 75–141—75–167, 75–168—75–179, 75–180, 75–181—75–191] * * *.' As further indication of the legislative intent, Ark.Stat.Ann. § 75–132.1 (Supp.1973) specifically states as follows, to-wit:

'(a) An owner of a mobile home shall be permitted to license said mobile home with the Department of Finance and Administration of the State of Arkansas for the purpose of receiving a certificate of title to said mobile home or for any other purpose.'

Both Ark.Stat.Ann. § 75–132 and 75–132.1 specifically make mobile homes subject to the titling statutes of this State, and 75–132 more specifically makes mobile homes subject to the provisions of Ark.Stat.Ann. § 75–160 and 75–161. Ark.Stat.Ann. § 75–160 and 75–161 (Supp.1973), are the general provisions dealing with the filing of liens and encumbrances upon any vehicle of a type subject to registration under the laws of the State of Arkansas. Specifically, Ark.Stat.Ann. § 75–160 (Supp.1973) provides as follows, to-wit:

'(a) No conditional sale contract, conditional lease, chattel mortgage, or other lien or encumbrance or title retention instrument *upon a vehicle, of a type subject to registration under the laws of this state* other than a lien dependent upon possession, is valid as against the creditors of an owner acquiring a lien by levy or attachment or *subsequent purchasers or encumbrances with or without notice until the requirements of this*

*article* [§§ 75–160, 75–161] *have been complied with.'* [Emphasis added].

Sub-section (b) of this Statute requires the depositing of a copy of the instrument creating and evidencing the lien with the Department of Motor Vehicles. Once this is accomplished, Ark. Stat.Ann., § 75–161 (Repl.1957), describes the effect of such filing, as follows, to-wit:

> 'Such filing and the issuance of a new certificate of title as provided in this article [§§ 75–160, 75–161] *shall constitute constructive notice of all liens* and encumbrances against the vehicle described therein to creditors of the owner, *to subsequent purchasers and encumbrancers* except such liens as may be authorized by law dependent upon possession \* \* \*' [Emphasis added].

Rex Financial Corporation followed the procedure outlined by the Arkansas Statutes and a new certificate of title was issued showing Rex's lien more than one year prior to the sale of the mobile home to Doyle Marshall, who, according to the Statutes, was then upon constructive notice of the lien of Rex and its rights as provided in that lien. \* \* \* there have been a substantial number of cases involving innocent purchasers such as Defendant Doyle Marshall claims to be in this case, who have been held bound by the constructive notice provisions of the Statute and thereby estopped from denying the validity of the prior lien holder of record. A case in point is *Bettis v. Manhattan Credit Company,* 230 Ark. 686, 324 S.W.2d 352 (1959). \* \* \*

\* \* \* \* \* \*

"Another Arkansas case following the same reasoning evidenced in the *Bettis* case is that of *Bank of Dardanelle v. Bibler Brothers,* 244 Ark. 534, 426 S.W.2d 152 (1968). However, the *Bibler Brothers* case finds for the subsequent purchaser because the lien holder failed to file with the Motor Vehicle Department its security instruments covering a trailer. Bibler Brothers purchased from one Elliott a trailer, although Elliott had previously executed several chattel mortgages to the Plaintiff bank. The bank had filed its mortgages with the Circuit Clerk, but not with the Department of Motor Vehicles. The Arkansas Supreme Court held, at 244 Ark. 536 [426 S.W.2d 152]:

> 'The failure to comply with Ark. Stats.Ann. § 75–160 (Supp.1967) and § 75–161 (Repl.1957) is controlling in this litigation.'

The Supreme Court went on to hold, at 244 Ark. 537 [426 S.W.2d 152]:

> 'In *West, Sheriff v. General Contract Purchase Corp.,* 221 Ark. 33, 252 S.W.2d 405, we pointed out that this statutory method of giving notice is exclusive, and we mentioned that there was no longer any necessity for the documents to be recorded. This holding was reiterated in *Francis v. Thomas,* 232 Ark. 547, 338 S.W.2d 933.

> 'While the mortgage was good, as between the parties (Elliott and the bank), *Anderson v. First Jacksonville Bank,* 243 Ark. 977, 423 S.W.2d 273, there was no notice of the encumbrance to third parties. The fact that appellant filed these mortgages with the Circuit Clerk is of no benefit whatsoever to the bank. Under the Statutes, and our cases, herein cited, no notice was given to Bibler that appellant had any sort of claim on the trailer.' "

On March 27, 1974, Rose's Mobile Homes received the two 1974 new style mobile homes and placed them on the sales lot. Under the floor planning agreement with Rex and upon receipt of said homes, Rose executed and delivered to Rex a promissory note in the principal sum of $7,416.00 with interest thereon, and security agreement as set forth in paragraph 4 of the findings of fact. These homes were also covered by the Financing Statement, Contract and Security Agreement of February 26, 1973.

Ark.Stat.Ann., § 85–9–306(2), (3)(a)(b) (Supp.1973) provides:

"(2) Except where this Article [chapter] provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten [10] days after receipt of the proceeds by the debtor unless

"(a) a filed financing statement covering the original collateral also covers proceeds; or

"(b) the security interest in the proceeds is perfected before the expiration of the ten [10] day period."

Section 85–9–503 provides that unless otherwise agreed a secured party has on default the right to take possession of the collateral and dispose of it as provided in § 85–9–504.

In support of their contention defendants cite and rely upon *Black v. Schenectady Discount Corp.*, 31 Conn.Supp. 521, 324 A.2d 921 (1974). The decision does not sustain the contention of defendants, but fully supports plaintiff as to its claim on the 1972 Fairway, serial No. 2662, sold first by Rose to Whitley and recovered by Rose and sold by him to Marshall. At page 924 of 324 A.2d, the court said:

"Turning to the Welch transaction, the mobile home, American No. 0419, which the Welchs purchased from Nu-Trend on September 5, 1972, had been previously owned by Ethel M. Heser. Welch knew of this prior ownership. The mobile home was identified as one for which there is a certificate of title on file with the motor vehicle department showing Ethel M. Heser as owner, Schenectady as first lienholder, and NuTrend as seller. The Welchs paid Sere $7495, and the only document of sale the Welchs possess is a receipt for money as 'payment for mobile home in full,' signed by Sere. Welch testified that he signed an application for a title certificate but had never received one from either NuTrend or Sere. Mrs. Heser had in fact defaulted on the payments on her retail instalment contract. She apparently returned possession of the mobile home to Nu-Trend but has never conveyed title to the home to either NuTrend or the plaintiffs Welch. Schenectady has never released nor assigned its interest in the mobile home. NuTrend then sold the home to the Welchs, as set forth above. When Schenectady sought information relative to the Heser default, it found the Welchs in possession of the mobile home. They refused to relinquish it to Schenectady on demand."

It held:

"In the instant case, it appears to be undisputed that a valid certificate of title had been issued to Mrs. Heser listing Schenectady as the lienholder. The Welchs applied for, but never received, a certificate of title to the American mobile home.

"Inasmuch as Schenectady has demonstrated to us the possible validity of its right to possession of the mobile home now in the possession of the plaintiffs Welch, we conclude that the injunction barring its right to institute a replevin action cannot stand."

The court in the *Black* case, supra, cited with approval the case of *National Shawmut Bank of Boston v. Jones,* 108 N.H. 386, 388, 236 A.2d 484, where the court at pages 485–86 said:

"Since defendant purchased in good faith without knowledge that the sale to him was in violation of the security interest of another and bought in the ordinary course from a person in the business of selling automobiles, he was a 'buyer in the ordinary course of business.' RSA 382–A:1–201(9). How-

ever, s. 307(1) permits him to take free only of 'a security interest created by his seller.' The security interest of the plaintiff was not created by Hanson-Rock, Inc., the defendant's seller, but by Wentworth Motor Co., Inc. Defendant, therefore, does not take free of the plaintiff's security interest under this section. Neither does he take free of the security interest by reason of the provisions of s. 307(2) relating to consumer goods even if he purchased for his own personal, family or household purposes (a fact not agreed upon) because 'prior to the purchase, the secured party * * * filed a financing statement * * *.' These are the only two provisions of Article 9 under which a buyer of goods can claim to take free of a security interest where a sale, exchange or other disposition of the collateral was without the consent of the secured party. The defendant does not benefit from either one. Article 9–306(2) gives the court no leeway to create any other exceptions to its dictates and no custom, usage or agreement has been brought to our attention which would permit us to do so. RSA 382–A:1–102(2). See *Lincoln Bank & Trust Co. v. Queenan,* 344 S.W.2d 383 (Ky.)."

The defendants also cite and rely upon *Commercial Credit Corp. v. National Credit Corp.* (1971), 251 Ark. 541, 473 S.W.2d 876. The defendants are completely mistaken in their interpretation of the holding of the Supreme Court of Arkansas. The trial court entered a judgment in favor of appellee, National Credit Corp., against Commercial Credit Corp., the appellant, for the amount it had collected from Edgerson and ordered that Edgerson make all future payments to National Credit Corp. The court, in reversing the trial court, said at page 550 of 251 Ark., p. 881 of 473 S.W.2d:

"We are of the opinion, therefore, that the decree of the chancellor must be reversed and this cause remanded with instructions to enter a decree directing National to deliver the title certificate on the vehicle involved to the appellant, Commercial Credit, so that it may deliver same to A. D. Edgerson with its security interest endorsed thereon. National is entitled to recover from Mr. Edgerson the $30.00 it paid for sales tax on the automobile."

The defendants also rely upon *Hamilton County Bank v. Tuten,* (Fla.App. 1971) 250 So.2d 17. The plaintiff in a replevin action appealed from a final summary judgment for defendants. The court at page 18 stated the question as follows:

"The basic question presented for our determination in this appeal is whether the said judgment was entered in accordance with our procedural rules governing the entry of summary judgment."

From a reading of the opinion one is unable to determine the facts in the case, and the court cannot accept the decision as supporting the claims of defendants.

The defendants also cite the case of *Williams v. Western Surety,* 6 Wash. App. 300, 492 P.2d 596 (1972). It is not necessary to comment on the decision other than to call attention to the facts stated by the court.

The defendants seek to avoid the force and effect of the statements contained in the sales contract between Marshall and Rose. At the time Marshall purchased the three homes, he signed a "Retail Buyer's Order" for each of the homes, Exhibits F, H and J. The order was "Subject to terms and conditions stated on this agreement." Under "Remarks" the following was typed in each application: "Seller will do no land developing. Mobile home purchased where is as is. Subject to conformation of title and subsequent satisfaction by holder." Each of the orders also contained the statement: "This _____is guaranteed to be free and clear from all encumbrances."

The defendants cite Ark.Stat.Ann., § 85–9–307(1) (Supp.1973), and § 85–1–201 (1961 Adden.), which provide:

"A buyer in ordinary course of business (subsection (9) of Section 1–201 [§ 85–1–201] other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

\* \* \* \* \* \*

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind \* \* \*."

The defendants then follow the above with the statement:

"It is clear from the statutory language that one who buys a mobile home from a mobile home dealer takes clear of a security interest created by his seller, even though the interest is perfected and even though the buyer knows of its existence, so long as he does not know that the sale is in violation of the security interest. Marshall, the buyer here, qualifies as a buyer in the ordinary course of business and will take free of Rex's security interests in the mobile homes."

The defendants argue that Marshall took the homes free of the security interests of plaintiff even though he knew of the existence of the security interest, and cite the Comments under § 85–9–307(1). Defendants apparently rely upon the Comments following § 9–307(1). The Comments are based upon § 9–301 and § 2–403, and conclude as follows:

"Reading the two provisions together, it results that the buyer takes free if he merely knows that there is a security interest which covers the goods but takes subject if he knows, in addition, that the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party."

The defendants also contend that under § 85–2–403 plaintiff entrusted the possession of the homes to Rose and that gave Rose the power to transfer all to a buyer in the ordinary course of business. A reading of the section along with other sections of the Code shows its inapplicability to the facts in the instant case, *Hollis v. Chamberlin,* 243 Ark. 201, 419 S.W.2d 116.

The court has examined all the decisions of the Supreme Court of Arkansas rendered since the Uniform Commercial Code became effective in Arkansas, which have considered questions presented by the Code. All of the decisions consider the underlying purposes and policies of the Code are to make uniform the law among the various jurisdictions.

In *Anderson v. First Jacksonville Bank,* 243 Ark. 977, 423 S.W.2d 273, the court at page 979 of 243 Ark., p. 274 of 423 S.W.2d said:

"Sections 85–9–301 to 85–9–304 are not here applicable. Those sections concern priorities of perfected and unperfected security interests as against third persons. This being a suit between the parties, Ark.Stat.Ann. §§ 85–9–201 to 85–9–204 (Add.1961) control. Section 85–9–201 reads: 'Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties. \* \* \*' See also *Ward Industries Corp. v. Bizzy Bee Cleaners, Inc.,* 6 Adams County Legal Journal 191 (Pa.1965). Section 85–9–203 provides that the only requirements for an enforcible security interest against a debtor are: (a) a written agreement; (b) the debtor's signature; and (c) a description of the collateral."

In *Planters Production Credit Asso. v. Bowles,* (1974) 256 Ark. 1063, 511 S.W.2d 645, the court at page 1067, 511 S.W.2d at page 647 stated that the question in the case "is whether a secured creditor may waive his security interest in collateral in favor of a third party purchaser of the collateral simply by his course of dealing with the debtor rather than by express or written waiver under the Uni-

form Commercial Code, as adopted in this state."

The court in discussing the case considered § 85–1–201, which provides:

"'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1–205 and 2–208 [§§ 85–1–205, 85–2–208]. Whether an agreement has legal consequences is determined by the provisions of this Act, is applicable; otherwise by the law of contracts (Section 1–103 [§ 85–1–103]) * * *."

The security agreement in the case covered crops to be raised by Bowles. At page 1070 of 256 Ark., p. 649 of 511 S.W.2d the court said:

"The testimony of the parties and witnesses is not germane to the precise issues before us, except the testimony of Mr. Conrad White, the president and general manager of PCA. We shall not set out Mr. White's testimony in detail because according to his uncontroverted testimony there is simply no question and no doubt that PCA, as a general practice and as a · general course of procedure, permitted all its members to sell or dispose of collateral at will, and relied on the member-debtor's honesty and integrity in applying the proceeds from such sale or disposition to the payment of his indebtedness to PCA."

At page 1071, 511 S.W.2d at page 649 the court said:

"The parties recognize the 1967 New Mexico case of *Clovis Nat'l Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726, as the leading case in which the secured party waived its lien under the 'or otherwise' phrase of the Code. In that case the New Mexico Code § 50A–9–306(2) was identical to our § 85–9–306(2), supra. The bank had loaned money on cattle in Clovis and the security agreement required written permission to sell. The bank, as secured party, permitted the debtor to sell the collateral (cattle) and relied on his honesty to apply the proceeds on the loan. The borrower finally sold some of the cattle at auction and .failed to apply the proceeds to the secured indebtedness. In a suit against the auctioneer for conversion, the court held that the bank's course of dealing in permitting the debtor to sell collateral and deposit the proceeds from such sales in his bank checking account from which he then made payments on his indebtedness, the bank waived its security interest lien on the cattle."

It will be noted that the court referred to the fact that § 50A–9–306(2) of the New Mexico Code is identical to our § 85–9–306. The trial court found in favor of PCA and the Supreme Court approved.

The court has carefully considered every contention of defendants and has stated the facts fairly and fully. From a consideration of all the facts, the court is convinced that Marshall was not a buyer in "the ordinary course of business" and was not acting "in good faith and without knowledge" when he purchased the homes. He was fully aware of the fact that plaintiff had floor planned and financed the homes and held a security interest in each home. He knew this by actual experience. He was making payments to plaintiff on another home that he had purchased from Rose. He bought the three homes from Rose because he had ascertained by his own investigation that he could buy them cheaper. He let his desire displace his knowledge and information and decided to take the risk and hoped that Rose could obtain the title to the homes.

Therefore, judgment will be entered for plaintiff, Rex Financial Corporation, in accordance with the prayer of the complaint for the value of the homes as found by the court except that no attorney's fee or rent will be allowed plaintiff. The value of the homes is $7,117.34 and $7,416.00. Possession of said homes shall be delivered to plaintiff on February 2, 1976, who may proceed to sell or

otherwise dispose of them in the manner provided by law. The counterclaim of defendants should be dismissed.