# WABASSO STATE BANK v. CALDWELL PACKING COMPANY AND ANOTHER.

251 N. W. 2d 321.

May 14, 1976—No. 45725.

*Schmidt, Thompson, Lindstrom & Thompson* and *John E. Mack,* for appellant.

*Fredrikson, Byron, Colborn, Bisbee, Hansen & Perlman, Jerome B. Pederson, Blethen, Ogle, Gage & Krause,* and *Bailey W. Blethen,* for respondents.

*John S. Jackson,* for Minnesota Bankers Association, amicus curiae, seeking reversal.

Heard before Otis, Peterson, and Yetka, JJ., and considered and decided by the court en banc.

OTIS, JUSTICE.

In this action plaintiff alleges that defendants purchased and converted to their own use certain feeder cattle in which plaintiff

has a security interest. The trial court granted defendants summary judgment, holding that plaintiff had authorized the sale by its course of dealing with its debtor and that plaintiff's security interest did not survive the sale. We reverse.

The question presented is whether one who finances farming operations and takes a security interest in cattle under an agreement which prohibits the sale of the collateral without the financier's prior written approval authorizes the borrower to sell the collateral by not objecting to a course of dealing in which the borrower has previously sold collateral without consent.

Clarence Marczak was a farmer engaged primarily in feeder cattle operations in Redwood County. Beginning in 1964, Marczak borrowed money from the Wabasso State Bank to purchase cattle for fattening and sale. From 1964 to 1972 Marczak sold the cattle which he had bought with the loan proceeds and paid the bank with the money obtained through the sale.

On July 21, 1969, pursuant to Minn. St. 336.9—401(1)(a), the bank properly filed with the Redwood County register of deeds a financing statement listing Clarence Marczak as debtor, the bank as secured party, and "feeder cattle" as the collateral. Between September 5, 1969, and November 20, 1970, the bank loaned Marczak $27,225 pursuant to written agreements giving the bank a security interest in cattle purchased with the proceeds.

Between April 16, 1971, and July 9, 1971, Marczak sold cattle worth $9,116.12 to respondent Caldwell Packing Company, and on November 11, 1971, Marczak sold cattle worth $2,199.47 to respondent Robel Beef Packers, Inc. The bank first learned that the cattle had been sold when on March 1, 1971, an auctioneer requested the bank to "clerk" an auction of Marczak's property. This action was then brought against Caldwell, Robel, and Marczak, but was dismissed as to Marczak when he became bankrupt. The security interest obtained by the bank included the following provision:

"Debtor will not sell or offer to sell or otherwise transfer or encumber the Collateral or any part thereof without written consent of Secured Party, will keep the Collateral in good order and repair, and will not permit any waste or damage thereto."

Edward Rabasse, managing officer of the bank, testified as follows:

"Q. Did you ever tell Mr. Marczak he could not sell any of the fifty-nine head?

"A. Not specifically. But, as I recall, not specifically, you just normally don't. You expect when they sell them they mortgage them, you collect when they sell to pay it.

\* \* \* \* \*

"Q. Has the bank ever enforced the provision in its security agreement to the effect that the debtor should obtain written permission from the bank to remove the collateral from his location?

"A. We have occasionally said that, but, you can't, depending upon who it is. If he is a trust worthy farmer I don't normally say anything.

"Q. So, you may have on occasion insisted upon the debtor coming into the bank and obtaining written consent, but that would be the exception?

"A. Not a farm loan.

"Q. Not a farm loan.

"A. Not a farm loan.

"Q. A feeder cattle operation loan?

"A. No.

"Q. What kind of loan are you talking about?

"A. Household goods.

"Q. I may have confused you. I'm talking strictly about farm loans. Then, am I correct in assuming that the bank, in connection with farm loans, has never enforced the debtor to obtain a written permission before he sells or engages—

"A. That is true.

\* \* \* \* \*

"Q. As Mr. Pederson went down here with you over all these transactions, I get the impression that as long as this fellow was dealing with you and you understood him to be all right, he continued to sell cattle whenever he felt they were ready and bring the proceeds in and pay you and this is the way it went?

"A. He had an excellent reputation in this area for honesty. He had been on this farm for, I believe, sixteen years. No reason to question his honesty.

"Q. So, it didn't concern you in the bank from 1964 up until the winter of 1972 that he was selling cattle from time to time as they got ready for market and after having sold them to not make the transaction with you, is that right?

"A. Yeh."

The trial court held that the bank in its course of dealing with Marczak, in not objecting when he sold cattle without first obtaining the bank's approval, authorized and consented to the sales here involved as a matter of law. Defendants rely upon Minn. St. 336.9—306(2):

"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor." (Italics supplied.)

The bank responds that the terms of the written security agreement expressly prohibit the sale of collateral without the bank's prior consent and hence a course of dealing cannot be relied upon to authorize the sale. It cites Minn. St. 336.1—205(4):

"The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable *express terms control both course of dealing and usage of trade* and course of dealing controls usage of trade." (Italics supplied.)

We are thus called upon to determine if these provisions are in conflict, and, if so, which provision prevails.

One of the purposes of the Uniform Commercial Code is "to make uniform the law among the various jurisdictions." Minn. St. 336.1—102(2)(c). However, when we look to those jurisdictions which have faced this issue we find that the decisions are evenly divided. The position adopted by the court below finds support in Clovis Nat. Bank v. Thomas, 77 N. M. 554, 425 P. 2d 726 (1967); Planters Production Credit Assn. v. Bowles, 256 Ark. 1063, 511 S. W. 2d 645 (1974); Lisbon Bank & Trust Co. v. Murray, 206 N. W. 2d 96 (Iowa 1973); Hedrick Sav. Bank v. Myers, 229 N. W. 2d 252 (Iowa 1975); Central Washington Production Credit Assn. v. Baker, 11 Wash. App. 17, 521 P. 2d 226 (1974); In re Cadwell, Martin Meat Co. 10 U. C. C. Rep. 710 (E. D. Cal. 1970); and United States v. Central Livestock Assn. Inc. 349 F. Supp. 1033 (D. N. D. 1972).

The position of appellant that Minn. St. 336.1—205(4) prohibits implied authority where the security agreement requires written authority finds support in Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N. W. 2d 99 (1971); Baker Production Credit Assn. v. Long Creek Meat Co. 266 Ore. 643, 513 P. 2d 1129 (1973); Vermilion County Production Credit Assn. v. Izzard, 111 Ill. App. 2d 190, 249 N. E. 2d 352 (1969); The Colorado Bank & Trust Co. v. Western Slope Investments, Inc. 539 P. 2d 501 (Colo. App. 1975); and United States v. E. W. Savage & Son, Inc. 343 F. Supp. 123 (D. S. D. 1972), affirmed, 475 F. 2d 305 (8 Cir. 1973). We also note the case of The Burlington Nat. Bank v. Strauss, 50 Wis. 2d 270, 184 N. W. 2d 122 (1971). In 1968 New Mexico by statute set aside the Clovis rule. N. Mex. Stat. Ann. 50A-1-205(3, 4) (1975 Supp.).

Article 9 of the Uniform Commercial Code established a recording system which permits a creditor, by filing a financing statement, to rely upon the secured position set out in his written security agreement. Borg-Warner Acceptance Corp. v. First Nat.

Bank of Pipestone, 307 Minn. 20, 238 N. W. 2d 612 (1976). Defendants argue:

"* * * The 'problem' arises not from the drafting of the security agreements, however, but from the Bank's decision to completely ignore its carefully drafted security agreements. The Bank could have easily protected itself by informing its farm loan debtors that it expected them to adhere to the terms of the security agreement and by reprimanding those who failed to do so." (Italics omitted.)

The fallacy in this argument is that it ignores the realities of the situation. The bank was not made aware of the sales of collateral before they occurred. Farmers would simply notify the bank of the sales when they came in with the proceeds to pay off the loan. At this point, not only was the bank not harmed by the sale but it was presented with an accomplished fact.

Examining the options open to both the bank and the purchasers of the cattle, we have no difficulty in determining which party was in a better position to protect its interests. On the one hand, the bank had complied with all of the provisions of Article 9. It did not rebuke those farmers who sold collateral without authorization, since after the fact such action would have had little effect. It had no prior knowledge of Marczak's plans to sell his cattle. On the other hand, the defendants had constructive notice of the bank's security interest and after checking the records, a simple phone call would have determined whether the bank had authorized Marczak's sale. Alternatively, when paying Marczak for the cattle, defendants could have named Marczak and the bank as joint payees on their check. Either action would have fully protected the bank and defendants. In any event, this is not a case of detrimental reliance since defendants had no way of knowing whether or not the bank had reminded Marczak of the necessity for prior approval of sales.

The following observation made by the Supreme Court of Nebraska in Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N. W. 2d 99, 103, is relevant:

"Lannon [the purchaser] must necessarily rely upon a previous course of dealing between the lender and the debtor, amounting to nothing more than a failure to object or rebuke the debtor for selling without written consent. At the same time [the lender] was entitled to rely upon its agreement and the provisions of the code giving it a continuing perfected security interest in the identifiable proceeds of the sale. Considering the realities involved in accomplishing a simultaneous exchange of property for money, we can find nothing in [the lender's] choice of alternatives in its previous course of dealing from which an inference could be drawn that it had waived its security agreement or that [the purchaser] was entitled to ignore the provisions of the code because of a private and undisclosed arrangement or course of dealing between the debtor and the lender alone. It must be borne in mind that in this case we are dealing with a controversy between the lender and a third party purchaser who had no knowledge of the course of dealing between the debtor and borrower. We are not called upon here to resolve a controversy between the lender and the debtor in which such an agreement or arrangement or course of dealing might be relevant to the enforcement of a security interest against the debtor's property.

\* \* \* \* \*

"As we have pointed out the mere failure to rebuke the seller, the reasonable acceptance of the proceeds of the sale when actually delivered to apply upon the debt, are not acts which indicate intention to waive a security interest, but in the event such unreasonable act is inconsistent and contradictory of the express agreement, then the express terms control both the course of dealing and the usage of trade between the parties. The action of the lender and the debtor and their course of dealings between themselves is reasonable and is consistent with the underlying policy of the code and the provision prohibiting waiver of the security interest unless expressed in writing."

Defendants contend that applying Minn. St. 336.1—205(4) to this case reads out of Minn. St. 336.9—306(2) the language "or otherwise." Such a view results from a misunderstanding of the operation of the two sections. As a result of the inclusion of "or otherwise" in Minn. St. 336.9—306(2), an authorization to sell collateral covered by an Article 9 security interest need not be included in the security agreement. If such authorization is given, in any form, the security interest does not survive the sale.

To the broad rule of Minn. St. 336.9—306(2) that any authority to sell destroys a security interest in the property sold, there is only the exception, set forth in Minn. St. 336.1—205(4), that neither course of dealing nor usage of trade can be used to contradict the express terms of an agreement. Course of dealing may be used to interpret the terms of an agreement but not to contradict them. In the instant case, the express terms of the security agreement required a prior written authorization to sell the collateral. Under Minn. St. 336.9—306(2), if defendants prove that that authorization was given in any form they are to prevail. However, under Minn. St. 336.1—205(4), when the security agreement requires prior written authorization, it cannot be proved by a course of dealing.

We note that those decisions which support the position taken by defendants in this case, Planters Production Credit Assn. v. Bowles, 256 Ark. 1063, 511 S. W. 2d 645 (1974); Central Washington Production Credit Assn. v. Baker, 11 Wash. App. 17, 521 P. 2d 226 (1974); In re Cadwell, Martin Meat Co. 10 U. C. C. Rep. 710 (E. D. Cal. 1970); and United States v. Central Livestock Assn. Inc. 349 F. Supp. 1033 (D. N. D. 1972), neither consider nor cite U. C. C. § 1—205(4). That section is also ignored by the majority opinion in Clovis Nat. Bank v. Thomas, 77 N. M. 554, 425 P. 2d 726. The only court which considered § 1—205 (4) and still found implied authorization was the Supreme Court of Iowa. However, in their first decision, Lisbon Bank & Trust Co. v. Murray, 206 N. W. 2d 96, the security agreement did not

contain a prohibition against sale without written consent. Section 1—205(4) was thus inapplicable, there being no express terms contrary to the course of dealing. When that court in Hedrick Sav. Bank v. Myers, 229 N. W. 2d 252, decided the effect of § 1—205(4) on § 9—306(2), Lisbon Bank was already the law of Iowa. We write on a clean slate, however.

Article 9 of the Code is an attempt to bring simplicity and certainty to the law of secured transactions through a system of written agreements and recorded notice. It is not our purpose to inject into the Uniform Commercial Code rules which unnecessarily confuse and complicate that thoroughly considered and carefully drafted body of law, unless to do otherwise would result in a manifest injustice.

Defendants' argument that the bank authorized the sale by failing to check periodically on the status of its collateral is foreclosed by Minn. St. 336.9—205.

Reversed.