**FIRST TENNESSEE PRODUCTION CREDIT ASSOCIATION, Plaintiff-Appellee,**

v.

**GOLD KIST, INC., Defendant-Third Party Plaintiff-Appellant,**

v.

**Roy C. CASON, Third Party Defendant-Appellee.**

Court of Appeals of Tennessee, Western Section.

March 16, 1983.

Application for Permission to Appeal Denied by Supreme Court June 20, 1983.

T.W. Tomlin of Somerville, Joel Porter of Memphis, for plaintiff-appellee.

John R. Smith of Memphis, for defendant-third-party plaintiff-appellant.

Margaret H. Tucker of Somerville, for third-party defendant-appellee.

CRAWFORD, Judge.

This action began when plaintiff-appellee, First Tennessee Production Credit Association (PCA), filed its complaint against defendant-appellant, Gold Kist, Inc. (Gold Kist), alleging that Gold Kist converted a crop of soybeans on which PCA held a valid and perfected security interest by purchasing and commingling the crop with its own soybeans. Gold Kist admitted that the crop was purchased by it, but joined issue on the remaining allegations of the complaint, and further averred in its answer that PCA had waived any right that it might have under the security agreement against any third-party purchaser. Gold Kist also filed a third-party complaint against Roy C. Cason (Cason) from whom it purchased the soybeans. The third-party complaint was based on two marketing contracts of sale in which Cason warranted that the beans were "free and clear of any crop lien, penalty, charge or encumbrance." The trial court found in favor of the plaintiff PCA and awarded it a judgment against Gold Kist in the amount of $22,415.43, plus prejudgment interest of $7,426.26. Gold Kist was awarded the same judgment against Cason on its third-party complaint.

Gold Kist appeals from the judgment of the trial court holding it liable for conversion in the purchase of the crops on which there was a valid and perfected security agreement. Gold Kist contends that the secured party, PCA, waived the provisions of its security agreement with Cason which prohibited the sale of the crops without PCA's written consent. Gold Kist asserts that PCA by a course of dealing authorized a sale of the collateral and that under Tenn. Code Ann. § 47–9–306(2) (1979), the security interest in the collateral and identifiable proceeds terminated. Cason has not appealed.

In 1978, and for many years prior thereto, PCA was engaged in the business of agricultural financing in Fayette County, Tennessee, and Gold Kist operated a grainery at Somerville, Fayette County, Tennessee. In 1978 PCA advanced its funds to finance the production of Cason's crops, and on June 2, 1978, Cason executed a financing statement and security agreement which was duly filed on June 16, 1978, in the register's office of Fayette County, Tennessee. The pertinent provisions of the financing statement and security agreement between Cason and PCA covering the crops involved are as follows:

> This Statement and Agreement secures an indebtedness of more than $200.00 and covers all of the Debtor's interest in the following described property . . .
>
> \*　\*　\*　\*　\*　\*
>
> 8. All proceeds of the sale or other disposition of any of the property described or referred to under Items 3 to 7, inclusive above . . .
>
> \*　\*　\*　\*　\*　\*

IT IS FURTHER AGREED and covenanted that, WHEREAS, the aforesaid Debtor(s) is (are) indebted to the aforesaid Secured Party-Lender and hereafter expect(s) to seek additional loans and advances from said Secured Party-Lender and desire(s) to give security for all such indebtedness and future advances:

NOW, THEREFORE, WITNESSETH: As security for the payment of all existing and future indebtedness and liabilities of Debtor to the Lender, and of all renewals and extensions thereof, and any and all additional loans and advances hereafter made by Lender, its successors or assigns, to Debtor prior to the filing of record of a Termination Statement exe-

cuted by Lender to the effect that Lender no longer claims a security interest hereunder, Debtor hereby gives and grants unto the Lender, its successors and assigns, a security interest in the property and goods described on the reverse side hereof, including Extension Sheets, and further covenants and agrees with the Lender as follows:

\* \* \* \* \* \*

6. That the Debtor will care for and maintain the crops and property described herein in a good and husbandlike manner and will not further encumber, conceal, remove, sell or otherwise dispose of the same without the written consent of the Lender and, upon demand, will provide additional collateral acceptable to the Lender.

\* \* \* \* \* \*

10. That, upon breach by the Debtor of any of the covenants or terms hereof, all indebtedness secured hereby shall, at the option of the Lender, become immediately due and payable . . .

\* \* \* \* \* \*

■ In the past Gold Kist had made an unsuccessful attempt to obtain a list of the farmers who had used their crops as collateral to obtain loans from PCA, but PCA refused Gold Kist's request, choosing instead to rely on its recorded security agreement. In 1978, Gold Kist contracted with Cason to purchase his soybean crop for that year but did not ask Cason whether the crop had any prior liens on it, nor was this information volunteered by Cason. Gold Kist made no effort to check the public records to determine if any security interest in Cason's crop had previously been filed. While no claim has been made that Gold Kist had actual knowledge of PCA's security interest, the security interest was duly perfected by the filing of the financing statement and security agreement, and Gold Kist is charged with constructive notice.

In the four years that Cason had been financing his crops through PCA, PCA had never enforced the provision of Paragraph 6

requiring written consent of the lender for the sale or disposition of the crops. Apparently this provision had not been enforced as to any of the debtor farmers with which PCA dealt.

■ The purchase of the soybean crop by Gold Kist was a purchase of farm products from a person engaged in farming operations which eliminates the applicability of § 9–307 which provides:

*Protection of buyers of goods.*—A buyer in ordinary course of business (subsection (9) of § 47–1–201) *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Tenn.Code Ann. § 47–9–307 (1979) (emphasis added).

Gold Kist asserts, however, that PCA cannot maintain an action for conversion against it because (1) PCA's acquiescence after-the-fact of similar sales by Cason without written consent over the past four years amounts to a waiver of the requirement in the security agreement for a written consent to sell, and (2) this same acquiesence amounted to PCA's "authorizing" this particular sale under § 9–306(2) which provides:

Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless his action was authorized* by the secured party in the security agreement *or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor.

Tenn.Code Ann. § 47–9–306(2) (1979) (emphasis added).

■ The security agreement provides in effect for default on unauthorized disposition of the collateral by the debtor, thus an action for conversion can be maintained by PCA if it did not authorize the sale. *See Mammoth Cave Production Credit Associa-*

*tion v. Oldham,* 569 S.W.2d 833 (Tenn.Ct. App.1977).

■ Gold Kist makes no contention that PCA gave written authorization for the sale of Cason's 1978 crop as required by the security agreement. Thus, the primary questions are whether the alleged course of dealing as above-mentioned can constitute a waiver of the specific requirement of a written authorization and whether such conduct by PCA constituted an authorization for the sale within the meaning of Tenn.Code Ann. § 47–9–306(2) (1979). If so, there would be no conversion by PCA.

The same factual circumstances control a determination of both waiver and authorization. The practical effect in this case of a finding either way appears to be identical. To prove a waiver of the contract provision, the proof must show that PCA voluntarily and intentionally relinquished its right to demand compliance with the written consent provision. *See Baird v. Fidelity Phenix Fire Insurance Co.,* 178 Tenn. 653, 162 S.W.2d 384 (1942).

■ While courts in other jurisdictions have admittedly split on the question of whether a secured party "authorizes" the debtor to sell the collateral by not objecting to a course of dealing in which the debtor has previously sold collateral without consent [1], we feel that Gold Kist's position is not tenable because it would not be reasonable to find that PCA had "authorized" Cason's sales in the past when each time PCA was simply presented with a *fait accompli.* As the Supreme Court of Minnesota observed in *Wabasso State Bank v. Caldwell Packing Co.,* 308 Minn. 349, 251 N.W.2d 321 (Minn.1976):

> The fallacy in this argument is that it ignores the realities of the situation. The bank was not made aware of the sales of collateral before they occurred. Farmers would simply notify the bank of the sales when they came in with the proceeds to

pay off the loan. At this point, not only was the bank not harmed by the sale but it was presented with an accomplished fact.

*Id.* at 324.

PCA could not have done anything more to protect its security interest, and its acceptance of the proceeds of the previous sales without written consent cannot realistically be termed a course of dealing as we normally think of the term.

■ Moreover, the express terms of an agreement will control when their construction is inconsistent with the course of dealing by the parties. Tenn.Code Ann. § 47–1–205(4) (1979). Perhaps one of the best observations on a similar situation was made by the Supreme Court of Kansas in *North Central Kansas Production Credit Association v. Washington Sales Company, Inc.,* 223 Kan. 689, 577 P.2d 35 (1978), wherein quoting from *Garden City Production Credit Association v. Lannan, supra,* it said:

> "Lannan, defendant here, must necessarily rely upon a previous course of dealing between the lender and the debtor, amounting to nothing more than a failure to object or rebuke the debtor for selling without written consent. At the same time P.C.A. was entitled to rely upon its agreement and the provisions of the code giving it a continuing perfected security interest in the identifiable proceeds of the sale. Considering the realities involved in accomplishing a simultaneous exchange of property for money, we can find nothing in P.C.A.'s choice of alternatives in its previous course of dealing from which an inference could be drawn that it had waived its security agreement or that Lannan was entitled to ignore the provisions of the code because of a private and undisclosed arrangement or course of dealing between the debtor and the lender alone. It must be borne in

---

1. *See Wabasso State Bank v. Caldwell Packing Co.,* 308 Minn. 349, 251 N.W.2d 321, 323 (Minn. 1976), for a collection of cases on the issue including the two leading cases of *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967), and *Garden City Production Credit Association v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971). The *Clovis* holding was abrogated by statute. *See* N.Mex. State Ann. § 55–9–306(2) (1973).

mind that in this case we are dealing with a controversy between the lender and a third party purchaser who had no knowledge of the course of dealing between the debtor and borrower. We are not called upon here to resolve a controversy between the lender and the debtor in which such agreement or arrangement or course of dealing might be relevant to the enforcement of a security interest against the debtor's property.

We are aware that section 1–205, U.C.C., provides that a course of dealing which by previous conduct between the parties, may alter an agreement by fact recognition. But, as we have said, we fail to see how a failure to rebuke or object contemporaneous with a delivery by the debtor and acceptance of the proceeds to which the security agreement attaches, can be construed as a voluntary and intelligent waiver by the lender of its right under a perfected security agreement against a third party purchaser, and this is particularly true when the security agreement itself provides a specific means for obtaining such waiver." 577 P.2d at 40.

■ Easily, the names of the parties in the case sub judice could be substituted in most details for the names of those in *North Central*. In the case at bar, plaintiff had a perfected security agreement, and defendant purchased the property covered by the security agreement without investigating for such liens. A point that seems often overlooked, or at least granted little attention, in the cases dealing with this problem is that the purchaser of the goods acts at his own risk when he fails to make the minimal investigation contemplated by the notice-filing system. The purchaser, thus, must in our opinion, carry a heavy burden to overcome the secured party's valid and perfected security interest. PCA did not authorize by written consent or otherwise the sale of the property described in the security agreement, nor did PCA waive the provisions of its security agreement. Thus, the purchase by Gold Kist was a conversion and entitled PCA to damages as awarded by the court. The evidence does not preponderate against the finding of the trial court; therefore, the judgment of the trial court is affirmed, and the costs of this appeal are adjudged against Gold Kist, Inc.

NEARN, P.J. (W.S.) and HIGHERS, concur.