Thomas H. ALLEN, Glenn H. Allen, Linda Karen (Allen) Draeger, and Malcolm J. Burgess, Plaintiffs-Appellants,

v.

SIMMONS MACHINERY COMPANY, INC., Defendant-Appellee.

Supreme Court of Tennessee, at Knoxville.

Feb. 27, 1984.

Stephen T. Greer, Dunlap, for plaintiffs-appellants.

William H. Horton, James David Kendall, Chattanooga, for defendant-appellee.

## OPINION

HARBISON, Justice.

This case arises under the Uniform Commercial Code. In this Court the principal question is whether appellee is liable to appellants for conversion of a dragline used in stripmining operations. The trial court found that a conversion had occurred; the Court of Appeals reversed. We are of the opinion that the judgment of the trial court was correct, and it is reinstated.

There were numerous other issues and other parties in the litigation in the trial court. Many of the pertinent facts were undisputed. There were disputes as to others, but as the case comes to this Court, following a remand to the Court of Appeals, these are the subject of concurrent findings supported by material evidence.

On September 23, 1976, appellants sold all of the stock of Allen Coal Company, Inc., a Tennessee corporation engaged in stripmining, to certain defendants who are not involved in this appeal. Appellants received promissory notes from the purchaser, and the purchaser also caused the corporation, Allen Coal Company, Inc., to grant a security interest to appellants in the dragline in question and other equipment owned by the corporation. Appellants filed a financing statement, UCC–1, with the Secretary of State on October 7, 1976. The sale occurred in Chattanooga, Tennessee.

In order to obtain funds to satisfy some of the conditions of purchase and also for use in other business enterprises not involved in this litigation, the purchaser, just prior to closing with appellants, but essentially as a part of the same transaction, borrowed funds from Credit Alliance Corporation of Atlanta, Georgia, and also gave that Company a security interest in the dragline and other equipment. Credit Alliance filed a financing statement with the Secretary of State on September 29, 1976 and, therefore, had priority in time over appellants.[1] The indebtedness to Credit Alliance, however, has subsequently been paid in full and it has made no claim to the dragline insofar as this appeal is concerned. Likewise, disposition of the other equipment involved in these transactions is not in issue here.

Appellants had no knowledge of Credit Alliance Corporation's financing statement or security interest. They were aware, however, of a prior outstanding security interest on the dragline held by ITT Industrial Company, securing purchase money obligations of Allen Coal Company, Inc. for the dragline. Appellant Thomas H. Allen had also personally guaranteed this indebtedness. In connection with the sale of corporate stock, Mr. Allen and the purchaser executed a separate agreement under which the purchaser agreed to try to obtain release of Mr. Allen on the ITT obligation within 60 days. Otherwise, Allen was given the right himself to sell the dragline. It was agreed that any excess over the ITT indebtedness should be applied to the purchase money notes given for the corporate stock. It was agreed by all parties to the litigation that there was an equity in the dragline over and above the ITT indebtedness.

In December 1976, Allen Coal Company, Inc., through its new officers, sold the dragline to appellee Simmons Machinery Company, Inc., which had its principal office in Birmingham, Alabama. At that time the dragline was situated in Tennessee, according to the preponderance of the evidence. There is some dispute with regard to this, and Mr. Simmons, President of appellee, stated that his sales manager understood that the equipment had been moved to Alabama.[2] It later appeared from testimony of the purchaser that the equipment might have been temporarily taken to Alabama for a very short time, but not with the consent of appellants or with their knowledge.[3]

In all events, Simmons purchased the equipment, leased it back to Allen Coal Company, Inc., and sold the latter some additional equipment, applying the equity of Allen Coal in the dragline toward the purchase of new equipment. Simmons was given a security interest in both the dragline and the newly purchased equipment. Simmons immediately assigned its security interest, the lease and purchase money notes to Leasing Service Corporation, Inc. of Atlanta, an affiliated corporation with Credit Alliance Corporation. All of these arrangements were made with the knowledge and consent of the latter. Leasing Service Corporation caused to be filed in the office of the Secretary of State of Tennessee a financing statement on December 13, 1976, securing a total indebtedness of $597,980.

Under its lease with Simmons, Allen Coal Company, Inc. retained possession of the dragline in Tennessee until the summer of 1977. Then it transferred the dragline to Kentucky. Later it defaulted on its lease. In 1978 Simmons, which had guaranteed to Leasing Service Corporation, Inc., its as-

1. Appellants challenged the validity of this security interest on several grounds. However, the indebtedness to Credit Alliance has since been paid in full, and there has been no assignment of its security interest. Credit Alliance consented to the subsequent sale of the dragline by the purchaser of the stock of Allen Coal Company, Inc.

2. The manager, Mr. Jackson, was not called as a witness, although shown to have been available for testimony.

3. The security agreement held by appellants prohibited removal of the equipment from a specified site without consent of the holder of the security interest.

signee, the indebtedness of Allen Coal Company, Inc., repossessed the dragline. Simmons later sold the equipment to a purchaser in Alabama.

Appellants had no knowledge of the sale of the dragline by Allen Coal Company, Inc. to Simmons when this occurred early in December 1976. They learned of it during January 1977; however, they were not advised of the details. They were advised that, in connection with that transaction, the prior security interest of ITT Industrial Company was terminated and Mr. Allen's personal obligation on the indebtedness of Allen Coal Company, Inc. to ITT was released. ITT's indebtedness was paid in full out of the proceeds of the purchase price paid by Simmons. Appellants believed that thereafter they held a first secured position on the dragline.

Both courts below have found that appellants did not expressly consent to or authorize the sale of the dragline to Simmons. Neither Simmons nor the company with which he did his financing, Leasing Service Corporation, Inc., checked the records in the office of the Secretary of State of Tennessee prior to the purchase of the dragline by Simmons. They had no actual knowledge of the prior outstanding security interest of appellants until about March 1977.

At that time, it was learned by all parties that there were three financing statements filed which covered the dragline, and a serious question of priority was presented. Appellants filed this action in the chancery court of Hamilton County, initially to ascertain the relative priorities of the security interests of themselves, Credit Alliance Corporation, Inc., and Simmons Machinery Company, Inc. (or its assignee, Leasing Service Corporation, Inc., which was later added as a party).

With full knowledge of the claim of appellants that they had not consented to the sale to Simmons, that they were still claiming a security interest and this interest survived the sale, Simmons later, without consent of appellants, repossessed the dragline and sold it to an out-of-state pur-

chaser. Appellants then amended their action to claim a conversion by Simmons.

Both the trial court and the Court of Appeals have found that appellants did not expressly consent to the sale to Simmons, and there is material evidence in the record to support that conclusion. The courts below have also found that by including in their security interest the proceeds of the sale of collateral, appellants did not impliedly consent to the sale, nor was there any other language in the security instrument or other documents relating to the sale of corporate stock which expressly or impliedly authorized disposition of collateral, including the dragline, without the consent of appellants.

The Court of Appeals, however, was of the opinion that the sale of the dragline to Simmons and the lease back of the same to Allen Coal Company, Inc. did not, in and of itself, amount to a conversion under the UCC. The Court of Appeals was of the opinion that the security interest of appellants continued under T.C.A. § 47–9–306(2) because the sale was unauthorized, but held that something more than the mere purchase of the equipment by Simmons was necessary in order to amount to a conversion.

Regardless of the correctness of that conclusion,[4] it appears here that Simmons not only purchased and leased the equipment back, but also later repossessed it, sold it out-of-state, and thereby either destroyed any lien of appellants or, at a minimum, made repossession and sale by appellants impracticable. This was done with actual knowledge that appellants were claiming a prior recorded security interest, and in spite of the fact that a suit was pending to determine the relative priority of security interests when these actions were taken.

■ We are of the opinion that the evidence sustains the finding by the chancellor that a conversion of the equipment was committed by Simmons, even though this

---

4. *See Mammoth Cave Production Credit Ass'n v. Oldham,* 569 S.W.2d 833 (Tenn.App.1977).

may have been in good faith and without tortious intent. Simmons was charged with notice of the prior outstanding security interest of appellants at the time it purchased the dragline;[5] there was clearly an equity in the dragline which Simmons permitted Allen Coal Company, Inc. to apply against the purchase of new equipment. The new equipment, however, was never at any time substituted as collateral to the claim of appellants nor did Simmons at any time undertake to protect the interest of appellants of which it had constructive knowledge from the beginning and actual knowledge no later than March 1977.

Essentially, Simmons has insisted from the beginning that appellants lost their security interest by authorizing the sale of collateral, expressly or impliedly, to Simmons. The courts below have found otherwise and, in our opinion, their decisions in that regard were correct. Appellants did not acquiesce in the application of the equity of Allen Coal Company, Inc. to the purchase of new equipment, had no knowledge that this had been done, and had a right to have their prior security interest honored unless and until it was voluntarily terminated, subordinated or declared invalid.

It has been suggested by appellee that no default had occurred in the purchaser's obligations to appellants when Simmons bought the dragline in December 1976. This is inaccurate. The security agreement held by appellants prohibited sale, disposition or encumbrance of the collateral without their consent. The granting of security interests to Credit Alliance in September 1976 and to appellee in December were both acts of default under the proof. When appellants learned of these, they demanded corrective action. None of the parties involved recognized or protected appellants' security interest or cured the defaults, even after suit was brought.

Numerous other issues were raised by appellee in the trial court and in the Court of Appeals. We have considered these and find the disposition of them by the courts below to be correct under the facts presented.

The judgment of the chancellor is reinstated at the cost of appellee. The cause will be remanded to that court for enforcement of the judgment and for any other orders which may be necessary.

FONES, C.J., and COOPER, BROCK and DROWOTA, JJ., concur.

---

**5.** *First Tennessee Production Credit Ass'n v. Gold Kist, Inc.,* 653 S.W.2d 418, 422 (Tenn.App.1983) ("the purchaser of the goods acts at his own risk when he fails to make the minimal investigation contemplated by the notice-filing system.").