ERLANDSON IMPLEMENT, INC., et al., Respondents,

v.

FIRST STATE BANK OF BROWNSDALE, Appellant.

No. C4-86-841.

Court of Appeals of Minnesota.

Feb. 10, 1987.

Henry J. Savelkoul, Christian, Slen, Savelkoul, Johnson, Broberg & Kohl, Albert Lea, for respondents.

William A. Baudler, Baudler, Baudler & Maus, Austin, for appellant.

Heard, considered and decided by NIERENGARTEN, P.J., and PARKER and CRIPPEN, JJ.

## OPINION

NIERENGARTEN, Judge.

The trial court ruled that appellant First State Bank of Brownsdale (the Bank) wrongfully took and sold certain farm machinery in satisfaction of its own interests ahead of two farm implement dealers who contended they had priority purchase money security interests. The trial court concluded that the sale constituted a conversion and that the Bank was liable to the dealers for damages totaling $19,569.77, and costs and attorney fees totaling $4,470. The Bank contends the trial court was incorrect in concluding that it "authorized" its debtors to trade farm machinery covered by security agreements without written consent. The Bank also contends the trial court erred by miscalculating damages and by awarding attorney fees. We reverse and remand.

## FACTS

In January 1979, Harry and Beverly Van Buskirk purchased a John Deere 4620 tractor in which the John Deere Company obtained a perfected security interest. In the spring of 1979, the Bank loaned the Van Buskirks operating funds for their farm and obtained a blanket security interest in the crops, equipment, inventory, accounts, and intangibles associated with the Van Buskirks' farming operations. The blanket security agreement included the John Deere 4620 tractor and required the Van Buskirks to obtain written consent from the Bank before selling or disposing of noninventory collateral. The security agreement contained an after-acquired clause with respect to equipment.

In May 1981, the Van Buskirks traded the John Deere 4620 tractor to Erlandson Implement, Inc. (Erlandson) and acquired a John Deere 4630 tractor. John Deere financed the balance due on the 4630 tractor and took a security interest in the tractor by filing a UCC–1 financing statement. The Van Buskirks owed John Deere $5,414.33 on the 4620 tractor at the time of the trade.

The Van Buskirks testified at trial that they filed annual financial statements to obtain operating loans, that they told the Bank of their trades, and that the Bank did not object to the trades. A Bank officer testified that the Van Buskirks never asked for nor received written consent to trade equipment, and that the Bank did not find out about the trades until 1982 when the Van Buskirks asked for permission to move from Swift County to Stearns County.

The Bank's blanket security interest also included the Van Buskirks' John Deere 635 cornhead and a John Deere 2500 plow. In October 1981, the Van Buskirks traded those implements to Isenberg Equipment, Inc. (Isenberg) as part of the purchase consideration for a John Deere 435N cornhead and a White 7–20 plow. John Deere financed the balance owing on the new implements and filed a UCC–1 financing statement. The Bank was not informed of

the transaction and did not give its written consent to the trade.

In 1982 the Bank began foreclosure proceedings against the Van Buskirks because they were in default on their payments to the Bank. The Van Buskirks filed for Chapter 7 bankruptcy in March 1983. At the request of John Deere, the bankruptcy trustee abandoned the John Deere 4630 tractor, the White 7–20 plow, and the John Deere 435N cornhead in May 1983.

In June of 1983 the Bank went to the Van Buskirks' farm near Brooten in Stearns County, picked up the Van Buskirks' equipment, and later sold the implements by auction sale at St. Cloud. The John Deere 4630 tractor sold for $12,500; the White 7–20 plow and the John Deere 435N cornhead sold for a total price of $2,760.

The Van Buskirks owed John Deere $16,-712.27 on the 4630 tractor, and $2,857.50 on the 435N cornhead and 7–20 plow. John Deere assigned the Van Buskirks' account on the tractor to Erlandson and the Van Buskirks' account on the cornhead and plow to Isenberg to collect the unpaid balance on those accounts.

Erlandson and Isenberg sued the Bank for conversion of the assets contending that, as John Deere's assignees, they were entitled to immediate possession of the equipment upon the Van Buskirks' default. The Bank filed counterclaims for conversion. The trial court found that "the Van Buskirks traded freely without need for approval by defendant bank and the bank did not object." The court also found that John Deere and the dealers held security interests in the equipment which were properly perfected and that those security interests had priority over the Bank's interests. The trial court ruled that the Bank's sale of the equipment constituted a conversion and adjudged the Bank liable for $24,-039.77 in damages, including $4,470 in costs and attorney fees. The Bank appeals.

## ISSUES

1. Did the trial court err by ruling that the Bank's security agreement "autho-

rized" the Van Buskirks to trade farm equipment covered by the security agreement?

2. Did the trial court err by ruling that the Bank's business dealings with the Van Buskirks constituted a waiver of the security agreement provision requiring the Bank's prior written consent for disposition of collateral?

3. Did the trial court err when it calculated damages without considering the Bank's counterclaim for conversion?

4. Did the trial court err by assessing attorney fees against the Bank?

## ANALYSIS

A trial court's findings of fact will not be set aside unless they are clearly erroneous and "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn.R. Civ.P. 52.01. A trial court's findings are clearly erroneous if there is no substantial evidentiary support or they were induced by an erroneous view of the law. *Anda Construction Co. v. First Federal Savings and Loan Association,* 349 N.W.2d 275, 277 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. Sept. 5, 1984).

### 1. Authority to Trade Equipment

The trial court concluded that the Bank's security agreement gave "the Van Buskirks the right to sell collateral without [the Bank's] approval during the ordinary course of business." The relevant provision of the agreement states:

*Debtor may sell any inventory constituting Collateral to buyers in the ordinary course of business,* and use and consume any farm products constituting Collateral in Debtor's farming operations.

(emphasis added). The Bank contends the trial court's interpretation is erroneous because only sales of "inventory" and use or consumption of "farm products" do not require the Bank's prior written consent, and because the tractor, cornhead, and

plow were "equipment" rather than inventory.

The Uniform Commercial Code defines "inventory" as goods which

are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business.

Minn.Stat. § 336.9–109(4) (1984) (emphasis added). "Equipment" is defined as goods which

are *used or bought for use primarily in business* (including farming or a profession) * * * or if the goods are not included in the definition of inventory, farm products or consumer goods.

Minn.Stat. § 336.9–109(2) (1984) (emphasis added).

The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale. Implicit in the definition is the criterion that the prospective sale is in the ordinary course of business. Machinery used in manufacturing, for example, is equipment and not inventory even though it is the continuing policy of the enterprise to sell machinery when it becomes obsolete. * * In general it may be said that goods used in a business are equipment when they are fixed assets or have, as identifiable units, a relatively long period of use; * *.

Minn.Stat.Ann. § 336.9–109 (West 1966) (UCC comment).

Tractors, plows, and cornheads ordinarily "are used or bought [by farmers] for use primarily in [their farming] business," and usually are not held for sale or lease or furnished under contracts of service. *See* Minn.Stat. §§ 336.9–109(2), 336.9–109(4). The record does not indicate that the machinery was used for anything other than the production of farm products. Therefore, the implements were equipment and the trial court erred by concluding the Bank's security agreement expressly authorized the Van Buskirks to trade the tractor and other farm machinery without prior written consent.

### 2. Waiver of Written Consent

■ The Uniform Commercial Code states that, unless otherwise provided:

[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Minn.Stat. § 336.9–306(2) (1984).

Whether the Bank knew of and acquiesced in the equipment trades is disputed. However, even if the Bank later knew of the trades and did not object it did not necessarily waive its rights to require written consent before sales or dispositions of noninventory collateral. *See Swift County Bank v. United Farmers Elevators*, 366 N.W.2d 606, 609 (Minn.Ct.App. 1985), *pet. for rev. denied*, (Minn. June 24, 1985) (a bank which previously had not objected to unauthorized sales of grain was "not estopped from requiring prior written authorization to sell the collateral").

In *First National Bank of LeCenter v. Farmers Union Marketing and Processing Association*, 371 N.W.2d 22 (Minn.Ct. App.1985), *pet. for rev. denied*, (Minn. Sept. 26, 1985), this court concluded that a bank's knowledge of its customer's livestock sales did not operate as a waiver of the bank's right to insist on compliance with the security agreement requiring written consent. *Id.* at 25.

The rule in Minnesota is clear. A security agreement expressly requiring prior written authorization to sell collateral cannot be defeated by evidence of a bank's past failure to object to unauthorized sales.

*Id.* (citing *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 251 N.W.2d 321 (1976); *Swift County Bank*, 366 N.W.2d 606 (Minn.Ct.App.1985); Minn.Stat. § 336.9–205 (1982)).

In *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 251 N.W.2d 321 (1976), the supreme court ruled that a bank did not lose its security interest in its customer's feeder cattle even though the bank knew its customers routinely sold their feeder cattle/collateral and the bank usually did not, if ever, enforce its debtors' obligations to obtain prior written permission before sale. Under Minn.Stat. § 336.-1-205(4),

> neither course of dealing nor usage of trade can be used to contradict the express terms of an agreement. * * * [W]hen the security agreement requires prior written authorization, it cannot be proved by a course of dealing.

308 Minn. at 356, 257 N.W.2d at 325.

The trial court erred by concluding that the Bank "authorized" the release of its security in the collateral because the Bank failed to oversee, control, or object in a timely manner to the Van Buskirks' trades and purchases. It is undisputed that the Bank never gave the Van Buskirks its written permission to sell or trade the equipment. Since the record does not indicate that authorization was given in any form and the security agreement requires prior written authorization, the alleged authorization to trade "cannot be proved by a course of dealing." *See id.*

### 3. Conflicting Security Interests

■ Priorities among conflicting security interests in the same collateral are determined by statute.

> A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter.

Minn.Stat. § 336.9–312(4) (1984). Individuals holding purchase money security interests may acquire those interests and take priority even if they know of other perfected security interests. *See* Minn.Stat.Ann.

§ 336.9–312 (West Supp.1987) (1972 Official Comment).

■ We conclude from our review of the record that John Deere and its assignees held a perfected purchase money security interest in the John Deere 4630 tractor, the John Deere 435N cornhead, and the White 7–20 plow because John Deere financed the acquisition of these particular items of machinery and it filed a UCC financing statement in a timely manner. *See* Minn.Stat. § 336.9–107 (1984) (defining "purchase money security interest"). Accordingly, John Deere's and its assignees' security interests had priority over the Bank's conflicting security interest in the equipment acquired under its blanket security agreement because the proceeds from the Bank's loan were only general operating funds and were not expressly intended to purchase specific equipment. *See* Minn.Stat. § 336.-9–312(4) (1984); Minn.Stat.Ann. § 336.9–107 (West 1966) (UCC Comment) ("a purchase money obligation has priority over an interest acquired under an after-acquired property clause").

■ While we agree that the implement dealers' security interests had priority over the Bank's conflicting security interest in the same collateral, we believe any claims under these priority purchase money security interests must be offset by the Bank's counterclaim for damages in conversion because we believe the Bank has a valid conversion claim against the implement dealers which the trial court did not recognize.

> [A] security interest continues in collateral notwithstanding sale, exchange or other disposition * * * and also continues in any identifiable proceeds * * *.

Minn.Stat. § 336.9–306(2) (1984).

> In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, * * * continues in the original collateral in the hands of the purchaser or other transferee. * * * [S]ince the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in the appropriate case maintain an ac-

tion for conversion. \* \* \* The secured party may claim both proceeds and collateral, but may of course have only one satisfaction.

Minn.Stat.Ann. § 336.9–306 (West Supp. 1987) (comment 3).

Since the Bank did not give its written consent prior to the Van Buskirks' unauthorized disposition of the 4620 tractor and the "old" plow and cornhead, and the Bank held a valid security interest in that collateral, the Bank's security interest continued in the traded equipment when it was acquired by the implement dealers during the trades. Consequently, the bank has a valid conversion claim against the implement dealers.

█ Since the trial court did not consider the Bank's conversion claim, we remand this case to the trial court to determine the appropriate measure of damages. The damages should be based on two findings.

First, the Bank's conversion claim requires a finding with respect to the value of the Bank's security interests in the 4620 tractor, the 2500 plow, and the 635 cornhead at the time of the trade. We note John Deere's priority purchase money security in the 4620 tractor amounting to $5,414.33. Second, the implement dealers' claims require a finding with respect to the reasonable market value of the 4630 tractor, the 435N cornhead, and the 7–20 plow at the time of the sale. We note especially the applicability of the uniform commercial code under which a secured party may "sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing." Minn.Stat. § 336.9–504(1). See Minn.Stat. § 336.9–507(2) (1984) (the fact that a better price might have been obtained if the items had been sold elsewhere or by a different method does not necessarily establish that the sale was not made in a "commercially reasonable manner").

### 4. Attorney Fees

█ Unless authorized by statute, attorney fees generally are not allowed in civil actions. *St. Paul Professional Employees Association v. City of St. Paul,* 303 Minn. 106, 109, 226 N.W.2d 311, 313 (1975). "Counsel fees and expenses are not damages." *Id.* We can discern no bad faith in this action which would justify an award for attorney fees. *See* Minn.Stat. § 549.21 (1984).

The implement dealers argue that John Deere had a provision in its security agreement entitling it to collect reasonable attorney fees and the trial court awarded the dealers attorney fees and costs incurred in their "collection actions" against the Bank. However, since the Bank was not a party to that agreement the contract provision does not apply to the Bank and the dealers' actions were not for "collection" purposes but were for the purposes of asserting separate conversion claims against the Bank. Accordingly, we believe the trial court erred in assessing attorney fees against the Bank.

### DECISION

The trial court erred by concluding the Bank's security agreement authorized the Van Buskirks to trade farm equipment and by concluding the Bank's conduct constituted a waiver of its right to require written consent prior to sale or disposition of noninventory collateral. The trial court also erred by determining that the implement dealers were entitled to recover the unpaid balance due on the 4630 tractor, and the new cornhead and plow. This case is remanded to the trial court for the purposes of addressing the Bank's counterclaims for conversion and for the purposes of making factual findings on damages consistent with the applicable statutory standards. Under the circumstances of this case, the trial court erred by assessing attorney fees against the Bank.

Reversed and remanded.