Melvin FRONNING, et al., Appellants,

v.

John BLUME, et al., Respondents.

No. C9–88–855.

Court of Appeals of Minnesota.

Sept. 27, 1988.

Review Denied Nov. 30, 1988.

Richard S. Roberts, Richard S. Roberts & Associates, Wheaton, for appellants.

Wickham Corwin, Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, N.D., for respondents.

Heard, considered and decided by SCHUMACHER, P.J., and RANDALL and MULALLY,* JJ.

## OPINION

SCHUMACHER, Judge.

Appellants brought an action alleging respondents fraudulently obtained a mortgage against appellants' property and that respondents acted in bad faith by denying appellant future credit and refusing to release discretionary loan funds. The trial court granted respondents summary judgment on both issues. Appellants now seek relief. We affirm in part and reverse in part.

## FACTS

Appellant Leslie Fronning and his wife Connie purchased a farm from Leslie's parents Melvin and Alice Fronning in September 1977 and financed the purchase by a contract for deed. Leslie's farm operations were financed exclusively through Norwest Bank, respondent, and Leslie also used Norwest for his personal banking needs. On September 1, 1977, Leslie was indebted to Norwest in the sum of $67,500. By April 20, 1984, this debt had grown to $132,000. The loans were secured by Leslie's farm machinery and his livestock which were valued at $145,000 in November of 1984.

Leslie maintains that he normally consulted respondent John Blume, a Norwest bank loan officer, on all financial matters. Blume's record of Leslie's loan account consists of comments that detail all actions taken by Blume on Leslie's loan account from January 12, 1984 through May 2, 1986.

The comments trace Norwest's efforts to further secure Leslie's loan. On April 11, 1984, Blume met with Leslie to discuss the probability of Leslie obtaining a long term loan through the Farmers Home Administration ("FmHA"). To secure such a loan, Leslie intended to use his real estate, which had to be otherwise unencumbered. Blume's April comments also indicate he wanted a decision by the FmHA on Leslie's loan by July 1 "or [the] loan will be termed on first real estate basis."

One year later Blume's comments indicated his concern for the size of Leslie's debt. Blume raised the possibility that Leslie might need to sell assets to reduce the debt and stated that he would only grant future loans that were secured by the FmHA. The comments also mention that a real estate mortgage was being recorded.

On April 3, 1985, Leslie signed a note renewing his loan of $132,000 that was to become due on November 20, 1985. He also executed two additional agreements and promissory notes for discretionary lines of credit through Norwest totaling $31,500 ninety percent of which was secured by FmHA. Of this sum, $24,500 was released to appellant. The remaining $7,000 was earmarked for appellant's purchase of a used tractor. However, Leslie found other financing for the tractor and Norwest Bank did not advance those funds.

Under the terms of the credit agreements, Norwest Bank was not obligated to lend Leslie any money. The first paragraph of the agreement states:

> However, each individual loan or advance will always be at the sole discretion of our officers, based on whatever information the bank then has with respect to your financial condition. Nothing herein should be interpreted as being a promise to make any one or more loans.

Leslie maintains that on the same day, John Blume told him that the bank examin-

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

ers needed something to make the loan package look better, and to prove that Leslie owned real estate. Leslie, his wife and his parents, went to Blume's office on April 17 to sign a document prepared by the bank.

Leslie recalled that his father objected to signing the document but that Blume persuaded Melvin to sign by telling him:

It's just a description of your farm, something to show the bank examiners, something I'm going to keep in my file or in the desk here. And Dad says, Well, if this is going to get recorded or anything, he said, I'm not going to sign it. He actually got up and started walking away, and John said, No, it doesn't mean a thing; it's just something for the examiners and me and I'll keep it here in my desk.

Leslie contends that he looked at the document prior to signing it but did not notice the word "mortgage" on the document. Leslie states that although he had never signed a mortgage before, he would know a real estate mortgage if he saw one.

Leslie maintains that he was first informed that Norwest Bank had a mortgage on his property in November 1985. In February 1986, Blume met with Leslie's attorney to discuss a possible auction sale. During the spring, Leslie sold his equipment and hogs netting $53,163.61 which the bank applied to his debt.

Appellants brought this action in April 1986. In their complaint, appellants claim the mortgage on the farm was fraudulently obtained, that the bank acted in bad faith by canceling Leslie's credit line and refusing to disburse promised funds.

In November 1987 the trial court granted respondents' motion for summary judgment on all of appellants' claims. One month later, appellants brought a motion seeking reconsideration which the trial court denied.

## ISSUES

1. Did the trial court err in granting respondents summary judgment motion on appellants' claim that respondents fraudu-lently induced appellants to sign a mortgage agreement?

2. Did the trial court err in granting respondents summary judgment motion on appellants' claim that respondent Norwest Bank acted in bad faith by canceling express and implied loan agreements and by refusing to release promised funds from a discretionary line of credit?

## ANALYSIS

This is an appeal from the trial court's order granting summary judgment in favor of respondents. When reviewing an award for summary judgment, this court must determine whether there are any genuine issues of material fact and whether respondent is entitled to summary judgment as a matter of law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn. 1979)

I. Appellants argue that respondents fraudulently obtained their signatures on a mortgage document. Appellants allege that Blume's statements on April 3 to Leslie Fronning and also on April 17 to Melvin Fronning led them to believe the document they signed had no legal effect and would be used only to satisfy the bank examiners.

Respondents contend that as a matter of law, appellants were not justified in relying on Blume's alleged representations, because they were contrary to the printed words of the mortgage agreement. Respondents' position is supported by the Minnesota Supreme Court:

[E]vidence as to oral promises relating to prior or contemporaneous matters not included within a written agreement fraudulently made to induce its execution may be sufficient to establish the defense of fraud in an action on such agreement.

*Vint v. Nelson,* 267 Minn. 490, 496, 127 N.W.2d 177, 181 (1964)

Appellants maintain that Blume told Melvin Fronning, "It doesn't mean a thing" and "it's just a description of your farm" referring to the document to be signed. Respondents argue that these statements

run contrary to the express language of the document. It is undisputed that the word "Mortgage" is printed on the top upper right-hand corner and also in the lower left corner. Further, the words "mortgagor" and "mortgagee" appear throughout the document.

The trial court found that the internal language identifying the document as a mortgage and describing its legal effect were terms of the document. The court also ruled that Blume's statements as alleged by appellants were contrary to those terms and that appellants' reliance thereon was unreasonable.

However, we hold that Blume's statements may be admitted to show the parties never entered into a mortgage regardless of the terms of the mortgage.

> The parol evidence rule is inapplicable to exclude evidence of fraudulent oral representations by one party which induce another to enter into a written contract. (citations omitted) * * * Evidence of fraudulent representations is not admitted to vary the terms of a contract but to establish that, because of such fraudulent representations, no enforceable contract was made. If such evidence was excluded, a party to a contract could seldom if ever, succeed on a claim of fraud.

*Johnson Bldg. Co. v. River Bluff Development Co.*, 374 N.W.2d 187, 193 (Minn.Ct. App.1985).

Blume's alleged misrepresentation of the very nature of the document is not contrary to an express term of the mortgage. The Minnesota Supreme Court has addressed a similar fact situation in which plaintiff alleged a certain document constituted a partnership agreement. *Hamilton v. Boyce*, 234 Minn. 290, 48 N.W.2d 172 (1951). In that case, the court found:

> It is apparent that the written instrument, by its terms, is a partnership agreement. However, the evidence of defendants tended to prove that the instrument was drawn up and signed by the parties not for the purpose of creating a partnership among themselves, but merely for the purpose of giving plaintiff

legal authority to operate the rest home while defendants were away on a proposed extended trip. * * * In determining whether parol evidence is admissible, a distinction is drawn between evidence tending to show that no contract has ever been made and evidence to contradict, vary, or add to the terms of a written contract. (citations omitted).

48 N.W.2d at 173–74.

In the present case, the facts as determined by the trier may well support a finding that appellants did not intend to enter into a mortgage April 17, 1987.

II. Appellant Leslie Fronning argues that respondents acted in bad faith by denying Leslie further credit without prior notice. Leslie alleges respondent Norwest Bank made promises to extend credit and then refused to do so. Leslie also alleges Norwest Bank acted in bad faith by refusing to release funds available through a discretionary credit line.

Fraud in credit agreements is governed by Section 513.33 of the Minnesota Statutes (1986) which reads in pertinent part:

> Subdivision 1 Definitions. For the purposes of this section, the following terms have the meanings given them:
>
> (1) "credit agreement" means an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation;
>
> Subd. 2
>
> A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.
>
> Subd. 3.
>
> (a) The following actions do not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of subdivision 2:
>
> > (3) the agreement by a creditor to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under prior credit

agreements, or extending installments due under prior credit agreements.

(b) A credit agreement may not be implied from the relationship, fiduciary, or otherwise, of the creditor and the debtor.

■ Under the language of the above statute, Leslie may only recover on an action stemming from a credit agreement if the agreement is in writing. This requirement applies to Leslie's claim for damages resulting from the bank's oral promises to give Leslie a larger part of the proceeds from the sale of his grain. Under the terms of the security agreement, the bank as the secured party is entitled to all the funds from the grain checks and would have expected to be repaid any funds it released from those checks. Any money the bank advanced to Leslie from the grain checks was a loan. The promise to advance the money was a credit agreement under the statute's definition and needed to be in writing.

■ Leslie's claim for damages resulting from the bank's refusal to grant further credit, beginning in September 1985, also fails under section 513.33. Leslie alleges that his course of dealing with Norwest entitled him to further credit from Norwest or a warning that no new credit would be granted. Subdivision 3(b) of the statute provides that no credit agreement between the parties may be "implied from the relationship, fiduciary or otherwise, * * *." The statute prohibits finding a credit agreement was created through the parties past dealings.

■ However, Leslie argues that respondents should be equitably estopped from using the protection offered by section 513.33. The doctrine of equitable estoppel is applied at the discretion of the court and is intended to prevent a party from wrongfully taking advantage of its legal rights. *Northern Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 409 (Minn.1979). We do not find that application of the doctrine is necessary in the present case.

■ Finally, Leslie accuses respondents of bad faith dealings by not releasing all the funds available under the two notes

creating discretionary lines of credit, executed April 3, 1985. Leslie believes he is entitled to the undisbursed $7,000 earmarked for the purchase of a used tractor for which he found alternate financing.

These agreements are in writing and satisfy the requirement of section 513.33. The language of the discretionary loan agreements expressly disclaims any obligation by Norwest to grant loans to Leslie. Leslie argues that despite the disclaimer language, the past dealings of the parties created an obligation for Norwest to extend the remaining $7,000 available under the agreement. The course of dealing between parties is defined as:

a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

Minn.Stat. 336.1–205(1) (1986). The Minnesota Commercial Code permits the parties' course of dealings to interpret terms of a written agreement but not to contradict them. *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 356, 251 N.W. 2d 321, 325 (1976). In the present case, appellant presents no evidence that the parties had entered into discretionary lines of credit agreements in the past which would lead Leslie to believe he would receive the entire amount available regardless of the purpose of the loan. Further, the bank did not act in bad faith by refusing to disburse loan funds after the purpose of the loan disappeared.

## DECISION

The trial court erred in granting summary judgment on the issue whether respondents fraudulently obtained appellants' signatures on a mortgage. A fact issue exists as to whether appellants intended to enter into a mortgage agreement with respondent Norwest Bank.

The trial court did not err in granting summary judgment on appellant Leslie Fronning's claim that respondents acted in bad faith by refusing to grant him further credit.

AFFIRMED IN PART, REVERSED IN PART.